**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ePlus Technology, Incorporated,
                    *Plaintiff-Appellee,*

            v.

Patricia Aboud, a/k/a Carole
Girard,
                    *Defendant-Appellant,*

            and

Daniel Jacques Akerib; Jean-Marie
Chartuny; George Bernachawy;
John Doe,
                    *Defendants.*

No. 02-1197

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-00-699-A)

Argued: September 25, 2002

Decided: December 3, 2002

Before WILKINS, MICHAEL, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Wilkins and Judge Michael joined.

---

## COUNSEL

**ARGUED:** John Francis Cahill, CARTER, LEDYARD & MIL-BURN, Washington, D.C., for Appellant. Michael Edward Geltner,

GELTNER & ASSOCIATES, P.C., Washington, D.C., for Appellee. **ON BRIEF:** Patrick C. Smith, LAW OFFICE OF PATRICK C. SMITH, P.C., Baltimore, Maryland, for Appellant. Erica S. Stoecker, Herndon, Virginia, for Appellee.

## OPINION

KING, Circuit Judge:

During the technology boom of the late 1990s, Patricia Aboud organized several credit scams to defraud computer equipment suppliers. To recover losses resulting from one of these scams, ePlus Technology, Inc. ("ePlus") filed a civil action in the Eastern District of Virginia, asserting that Aboud had violated state tort law and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"). Following a bench trial in 2001, the district court found Aboud liable on both state and federal claims, and it awarded ePlus $891,423 in damages, plus attorneys' fees and costs. *ePlus Tech., Inc. v. Aboud*, CA-00-699-A, Memorandum Opinion, at 20-21 (E.D. Va. Dec. 5, 2001) (the "Opinion").

In this appeal, Aboud raises several challenges to the court's judgment in favor of ePlus. She primarily insists that the court lacked jurisdiction over her, that her trial was tainted by the court's consideration of material not admitted into evidence, and that the evidence was insufficient to establish the "pattern of racketeering activity" necessary for a civil RICO violation. 18 U.S.C. § 1961(1), (5). Because Aboud's contentions are unavailing, we affirm the district court.

### I.

### A.

From the summer of 1999 until the spring of 2000, Aboud used a Canadian corporation to swindle computer equipment suppliers through what is known as a "bust-out scheme."[1] In a typical bust-out

---

[1] We recite the facts in the light most favorable to ePlus, the party that prevailed below. *Randall v. Prince George's County*, 302 F.3d 188, 201 (4th Cir. 2002). The district court, in its Opinion, made explicit findings of fact, which we review for clear error. Fed. R. Civ. P. 52(a).

scheme, promoters form a seemingly legitimate corporation. At the outset of the scheme, the corporation's bills are paid, and its creditors are lured into extending larger and larger lines of credit. The schemers then use these inflated credit lines to obtain merchandise from suppliers, sell the merchandise at fire sale prices, and loot the corporation of its assets. Ultimately, the debtor corporation files for bankruptcy, and creditors can lose millions from unpaid and uncollectible debts. *See United States v. Crockett*, 534 F.2d 589, 592 (5th Cir. 1976) (describing typical bust-out scheme).

1.

Aboud orchestrated such a bust-out scheme through her ownership and control of Micro Business Technology ("MBT"), a Canadian corporation ostensibly in the business of buying, assembling, and reselling computer components.[2] Opinion at 3. Aboud used MBT to establish credit lines with various wholesalers of computer equipment. *Id.* at 4. Just before MBT filed for bankruptcy in Canada, Aboud and her co-schemers charged large orders of computer equipment, sold the equipment at artificially-discounted prices, and stole the proceeds from MBT, leaving MBT with neither assets nor records. By the time MBT filed for bankruptcy in March of 2000, Aboud and her co-schemers had defrauded MBT's creditors out of millions of dollars. *Id.* at 5, 7-8, 14. As the district court found, "[t]he scope of the bust out scheme perpetrated by Aboud and her coconspirators is highlighted by the number of victims and the magnitude of their losses." *Id.* at 14.

MBT's business with ePlus commenced in a seemingly innocent fashion during the summer of 1999. In July of that year, George Bernachawy, "representing MBT and acting in furtherance of Aboud's scheme and conspiracy," placed two small orders for computer equipment with International Computer Networks ("ICN"). *Id.* at 6. These orders totaled between $15,000 and $20,000, and MBT paid for them with a credit card. *Id.* Within weeks after these orders were placed, ePlus acquired ICN. Thereafter, Bernachawy "pressed [ePlus] to allow MBT to purchase larger orders of computer compo-

---

[2]Micro Business Technology is incorporated in Canada under the name "3099 2119 Quebec Incorporated."

nents on credit from plaintiff, purportedly for use in connection with MBT's manufacture and assembly of clone PCs." *Id.* Bernachawy represented to ePlus that MBT needed computer parts to use in its Canadian computer assembly factory, which he claimed employed thirty workers. In truth, there was no MBT factory, MBT never had more than six employees, and fraud — not computer assembly — was MBT's business. *Id.* at 4.

During the latter part of 1999, Bernachawy, representing MBT and acting on behalf of Aboud, continued to order computer equipment and supplies from ePlus. With an initial thirty-day credit limit of $25,000, Bernachawy ordered, and MBT timely paid for, over $450,000 in computer components. *Id.* at 7 n.8. The business relationship between MBT and ePlus progressed without incident until December 1999, when MBT was late on a payment. *Id.* at 7. At this point, ePlus contacted Bernachawy regarding the unpaid bill, and Bernachawy falsely told ePlus that the payment was late because MBT could not obtain a certified check while Canadian banks were closed over the holiday season.[3] During this telephone conversation, Bernachawy attempted to order additional computer components, but ePlus declined to extend MBT's credit because of its outstanding debt to ePlus. Ultimately, MBT made the overdue payment to ePlus, but the payment was approximately two weeks late. *Id.*

Following this late payment, "plaintiff increased MBT's credit line, reasonably relying on the false statements and promises of Aboud and her agents." *Id.* Thereafter, in March 2000, MBT was late on another payment to ePlus for approximately $129,000. When ePlus contacted MBT, Bernachawy asserted that the payment had been delayed because Aboud was selling MBT to a Chicago company owned by a Daniel Akerib. *Id.* Aboud did in fact transfer her MBT stock to Akerib, one of her co-schemers, on February 23, 2000. According to the district court, however, "[i]t is clear that the alleged 'purchase' of MBT was executed to allow Aboud to deny she had anything to do

---

[3]Apparently, Canadian banks cannot close during the holiday period at issue. According to Herbert Davis, the Canadian Bankruptcy Trustee handling MBT's bankruptcy, a Canadian bank might close briefly on Christmas Day, but it cannot remain continuously closed for more than 72 hours.

with the bust out scheme, although she continued in fact to be part of the scheme." *Id.* at 7 n.9. Aboud, using the alias "Carole Girard," continued to control MBT after transferring her MBT stock. *Id.* As the nominal owner of MBT, Akerib functioned as Aboud's front-man and accomplice in the bust-out scheme, and he became the "fall guy" in MBT's bankruptcy. *Id.* at 3.

When Bernachawy falsely advised ePlus about the change in MBT's control, he also attempted to place another order for more than $120,000 of computer equipment. *Id.* at 8. Because of the debt owed by MBT, however, ePlus refused to ship any additional orders. *Id.* Bernachawy then promised ePlus that MBT would immediately pay the outstanding bill, and ePlus received a check, in the sum of $129,000, on March 20, 2000. *Id.* Relying on this tender of payment, ePlus shipped MBT half of the new order, valued at $66,420. *Id.* As the court found, however, "Aboud and her co-conspirators knew full well that the $129,000 check would not be paid and they also never intended to pay for the new shipment." *Id.*

On March 23, 2000, MBT filed for bankruptcy in Montreal, Canada. On that same day, Bernachawy called ePlus to request that it ship the other half of the $120,000 order. *Id.* In this conversation, Bernachawy concealed MBT's bankruptcy filing, and he failed to advise ePlus that the $129,000 check was drawn on insufficient funds. In this conversation, ePlus advised Bernachawy that no additional shipments would be sent to MBT until its account with ePlus was cleared. In response, Bernachawy stated that MBT was sending yet another check. *Id.* at 8-9.

2.

In the execution of this scheme, Aboud played a central role. She "acted as MBT's president and was the leader of the conspiracy," and MBT's employees acted as her agents and co-conspirators in conducting the fraudulent affairs of MBT. *Id.* at 6. Furthermore, Aboud personally prepared and faxed to potential suppliers several credit applications that contained misleading credit references and false statements regarding MBT's business. *Id.* at 4-6. For example, "[i]n furtherance of the scheme, to persuade plaintiff to allow MBT to purchase larger orders on credit, in August 1999, Aboud transmitted to

plaintiff by facsimile a credit application falsely stating that MBT upgraded and built computer systems." *Id.* at 6. Aboud also listed a company affiliated with MBT, Olympique Transport, as an independent credit reference. In truth, Olympique Transport was "a company that was located next door to MBT and was in fact not independent of MBT." *Id.*

Similarly, Aboud, as part of the scheme, provided false information to Dun & Bradstreet in connection with its preparation of two reports on MBT, a Business Information Report and a Supplier Evaluation Report (collectively, the "D&B Reports"). *Id.* at 9. Such reports are routinely used by creditors in assessing whether to extend credit to other businesses. In submitting information to Dun & Bradstreet, Aboud misrepresented the number of MBT's employees, the nature of MBT's business, and the fact that she and Girard were the same person. Significantly, Aboud's false statements to creditors and to Dun & Bradstreet gave the appearance that MBT was a legitimate company. *Id.* at 4-5, 17 n. 15.

In addition to the misrepresentations she made to Dun & Bradstreet, Aboud lied to MBT's creditors about her identity. She frequently used her alias, Carole Girard, to distance herself from the scheme she was orchestrating. *Id.* at 3. For example, acting in her role as Girard, Aboud often answered MBT's telephone and advised its creditors that Aboud was unavailable or no longer connected to MBT. *Id.* at 9-13. On April 5, 2000, a private investigator hired by ePlus confronted Aboud about her double identity. On this occasion, she initially insisted that Aboud and Girard were different persons. When challenged, however, she acknowledged the duplicity, but explained that "Carole Girard" was her married name and "Patricia Aboud" was her maiden name. In this appeal, Aboud admits that she used both names, but she maintains that such activity was not misleading. The district court found, however, that "Aboud's misrepresentations about her true identity were used to avoid and frustrate vendors' collection efforts." *Id.* at 14.

### 3.

In addition to victimizing ePlus, Aboud and her co-schemers swindled several other computer equipment suppliers in the MBT scam.

*Id.* For example, Aboud used MBT to defraud Distributive Systems Services, Inc. ("DSS"), a Pennsylvania supplier of computer equipment. In order to establish credit for MBT, Aboud sent DSS a credit application, "falsely representing that she and Girard were different individuals and falsely describing MBT's nonexistent personal computer factory." *Id.* at 9. DSS relied on Aboud's false statements, which were also reflected in the D&B Reports. *Id.* Because of these misrepresentations, DSS extended MBT a substantial line of credit beginning in August 1999. *Id.* Over the course of MBT's relationship with DSS, Akerib, working with Aboud and nominally on behalf of MBT, sent DSS fourteen separate checks that failed to clear. *Id.*

In February 2000, with MBT's account in arrears, James Sweeney, the President of DSS, traveled to Montreal to visit MBT's factory. *Id.* at 9. As the court found, "Sweeney's previous attempts to travel to Montreal to visit the factory were deliberately discouraged, frustrated, or postponed by Aboud and Bernachawy, all in a concerted effort to conceal from Sweeney that MBT had no factory and was a sham enterprise used in their bust out scheme." *Id.* at 9 n.10. In Montreal, Bernachawy and Aboud (acting as Girard) literally gave Sweeney the runaround. *Id.* at 9-10. They scheduled a visit for Sweeney to see the non-existent MBT factory, but Bernachawy got lost driving Sweeney around Montreal. *Id.* at 10. Once they were late for the factory appointment, Bernachawy took Sweeney back to the MBT office. After allegedly speaking to factory employees, Bernachawy informed Sweeney that MBT's non-existent factory was too busy for their visit. *Id.*

Based on incidents such as these, the court concluded that MBT had defrauded DSS, using deception to induce DSS to ship MBT computer equipment on credit. *Id.* Although MBT initially paid DSS for certain orders, its debt to DSS had grown to more than $1,500,000 by February 2000. *Id.*

At trial, representatives of five other computer equipment suppliers told similar stories.[4] According to the representatives of these compa-

---

[4]These other creditors providing trial evidence included: Theta Systems, Inc.; Gemini Digital Products Corp.; TJS Electronics and Peripherals, Inc.; Emtec, Inc.; and Intelligent Decisions, Inc., a Virginia corporation. *Id.* at 10-13.

nies, Aboud sent them falsified credit applications, in which she lied about MBT's non-existent factory and used her alias in a misleading way. *Id.* at 14. Further, these companies relied on the false information that Aboud had provided to Dun & Bradstreet. Finally, Aboud frequently misrepresented her identity when creditors called to inquire about unpaid bills. The district court concluded that "the course of dealings between various computer component vendors whose employees testified and MBT reveal a similar pattern of fraudulent conduct by Aboud and her agents and coconspirators." *Id.*

All told, more than fifty creditors lost money from MBT's bankruptcy. MBT accumulated roughly $10,000,000 in debt to buy computer components, but it had no assets when it filed for bankruptcy in March 2000. When Herbert Davis, MBT's Bankruptcy Trustee, assumed control of the business, he found no equipment, no money, and no records. As the court concluded, "once the conspirators had extracted all the money from MBT, they caused the enterprise to declare bankruptcy, leaving plaintiff and the other vendor-victims to pick over MBT's meatless carcass." *Id.* at 5.

4.

The trial evidence revealed that Aboud had previously orchestrated bust-out schemes using two other companies, Gold Copy and Colis-Pac. In these other schemes, like the MBT scheme, Aboud extracted large quantities of merchandise from suppliers, sold the goods, and hid the proceeds before the corporate entities filed for bankruptcy. *Id.* at 13. Like MBT, these entities wound up with neither assets nor records when the Trustee took control. As the court found, "after bankruptcy, both Gold Copy and Colis-Pac, like MBT, did not cooperate with the bankruptcy trustee, claiming that missing records were either lost or did not exist." *Id.* Further, "Aboud removed large sums of money from Gold Copy and Colis-Pac and paid unjustified corporate money to third-parties." *Id.* Notably, the same individuals — Aboud, Akerib, Bernachawy, and Jean-Marie Chartouni — operated MBT, Gold Copy, and Colis-Pac. *Id.*

B.

In all likelihood, Aboud defrauded MBT creditors out of more than $10,000,000. *Id.* at 14. Seeking to recover its part of these losses, ePlus filed this action on April 27, 2000, in the Eastern District of Virginia, asserting fraud and civil RICO claims against Aboud, Akerib, Bernachawy, and Chartouni. *Id.* at 1. The court entered a default judgment against Akerib when he failed to file an answer. *Id.* Because Bernachawy and Chartouni were not served in accordance with the Federal Rules of Civil Procedure and the Hague Convention,[5] the claims against them were dismissed without prejudice. *Id.* Therefore, Aboud is the only remaining defendant.

The court conducted a three-day bench trial on August 20, 21, and October 4, 2001. *Id.* at 2. After considering the evidence, it found Aboud liable to ePlus for fraud under Virginia law and for violating the RICO statute. *Id.* at 20-21. At trial, ePlus presented the testimony of eight witnesses and related documentary evidence, while Aboud presented no evidence and did not attend the trial. Indeed, she stipulated that, had she been called to testify, she "would refuse to answer any and all substantive questions in this matter on the grounds that such answers might be used against [her] in a possible criminal prosecution or proceeding." *Id.* at 2-3.

In its Opinion, the court concluded that Aboud had conspired and schemed with Akerib, Bernachawy, and Chartouni to defraud ePlus. *Id.* at 3-4. It awarded ePlus compensatory damages in the sum of $297,141, and it then trebled the award under RICO, pursuant to 18 U.S.C. § 1964(c).[6] The judgment against Aboud totaled $891,423, plus attorneys' fees and costs. *Id.* at 20-21. Aboud filed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[5]As the court noted, the Hague Convention is the common name for the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 20 U.S.T. 362 (1964). *See* Opinion at 2 n.4; *see also* Fed. R. Civ. P. 4(f)(1).

[6]Section 1964(c) of Title 18 of the United States Code provides, in relevant part, that an injured party "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

On appeal, Aboud challenges the court's judgment on several bases. First, she maintains that the court lacked personal jurisdiction over her. Second, according to Aboud, the trial was irrevocably tainted because the court considered material not admitted into evidence. Third, Aboud contends that the intracorporate immunity doctrine precludes the finding that she conspired with other employees of MBT. Fourth, she challenges the sufficiency of the evidence supporting the fraud award. Finally, Aboud insists that ePlus failed to present sufficient evidence of the "pattern of racketeering activity" necessary to support its civil RICO claim. We address each of these contentions in turn.[7]

## II.

We first assess whether the district court properly exercised jurisdiction over Aboud, a Canadian citizen. According to Aboud, ePlus only connected her to Virginia through a single telephone call, and the court found that this call was made by Bernachawy. Aboud also contends that, even if she directed MBT's operations, jurisdiction over her cannot be predicated on the Virginia contacts of MBT or its agents. On the other hand, ePlus asserts that the actions of Aboud's agents and co-conspirators can be the basis for the court's exercise of jurisdiction. As explained below, we conclude that Aboud had sufficient contacts with the forum to support the court's exercise of jurisdiction.

## A.

In assessing the jurisdictional issue, we observe that ePlus, as plaintiff, bore the burden of establishing the basis for jurisdiction in the district court. *See Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In considering whether the court properly exercised jurisdiction over Aboud, we review relevant findings of fact for clear error, while we review de novo its legal determinations. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002),

---

[7]Aboud also maintains that the district court should not have held her personally liable for the corporate obligations of MBT. In fact, however, the court held her liable to ePlus for her personal wrongdoing, not for the actions of MBT.

*petition for cert. filed*, 71 U.S.L.W. 3247 (U.S. Sept. 12, 2002) (No. 02-463).

B.

In general, the federal district courts exercise personal jurisdiction in the manner and to the extent provided by state law. *Id.* In other words, a district court has personal jurisdiction over a defendant if the state courts where the federal court is located would possess such jurisdiction. Fed. R. Civ. P. 4(k)(1)(A); *Combs*, 886 F.2d at 675 (recognizing that "personal jurisdiction of federal courts of course may be grounded in state long-arm (or other) jurisdiction statutes in civil RICO cases"). Here, the district court possessed jurisdiction over Aboud because she was subject to the jurisdiction of the Virginia courts.

For state courts to possess personal jurisdiction over a defendant, a state statute must confer jurisdiction, and the exercise of jurisdiction must be consistent with due process requirements. Like most other states, Virginia has a long-arm statute that extends the jurisdiction of its courts as far as federal due process permits. Va. Code Ann. § 8.01-328.1(A);[8] *John G. Kolbe, Inc. v. Chromodern Chair Co.*, 180 S.E.2d 664, 667 (Va. 1971). Therefore, "'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *ALS Scan, Inc.*, 293 F.3d at 710 (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996)). As a result, we need only assess whether subjecting Aboud to jurisdiction in Virginia was consistent with due process.

---

[8]The Virginia long-arm statute provides in relevant part as follows:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent . . . : 1. Transacting any business in this Commonwealth; . . . 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

Va. Code Ann. § 8.01-328.1(A).

In order for a court's exercise of jurisdiction to satisfy due process requirements, a defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotes omitted). In applying this standard, the constitutional benchmark is "whether the defendant purposefully established minimum contacts in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotes omitted). Furthermore, a defendant should be able to anticipate being brought to court in the forum, in that contacts "must be directed at the forum state in more than a random, fortuitous, or attenuated way." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In essence, a defendant must have minimum contacts with the forum state, and a court's exercise of jurisdiction must be reasonable.

## C.

While the fact that Aboud's contacts with Virginia were made on behalf of MBT complicates the traditional due process inquiry, her connection to the Commonwealth is sufficient to support the court's exercise of jurisdiction.[9] In the typical case, the contacts of a company are not attributed to a corporate agent for jurisdictional purposes. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) (holding that employees' "contacts with [the forum] are not to be judged according to their employer's activities there"). On the other hand, Aboud is not immune from jurisdiction in Virginia merely because her contacts with the Commonwealth were made ostensibly on behalf of MBT. *Id.* (noting that employees' "status as employees does not somehow insulate them from jurisdiction"). Therefore, the court's exercise of jurisdiction was proper if Aboud had sufficient contacts with Virginia, even if those contacts were made ostensibly on behalf of MBT.

---

[9]The court may also have asserted jurisdiction over Aboud because she was the principal of MBT, and Bernachawy and the other employees of MBT acted as her agents. The Virginia long-arm statute explicitly permits jurisdiction to be based on the acts of agents. *See* Va. Code Ann. § 8.01-328.1(A).

In order to obtain credit for MBT from Virginia corporations, Aboud submitted false information to Dun & Bradstreet, and she faxed credit applications to ePlus and Intelligent Decisions, Inc. in Virginia. Because ePlus's claims involve credit fraud, these acts alone are sufficient to justify the court's exercise of jurisdiction over Aboud. *See English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990) ("[A] single act by a nonresident which amounts to transacting business in Virginia and gives rise to a cause of action may be sufficient to confer jurisdiction upon [Virginia] courts.") (internal quotes omitted) (second alteration in original); *see also ESAB Group, Inc.*, 126 F.3d at 625 ("[C]ontacts related to the cause of action must create a 'substantial connection' to the forum state.") (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

Furthermore, the exercise of jurisdiction over Aboud does nothing to "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. Put simply, there is nothing unreasonable about subjecting her to jurisdiction in Virginia. Aboud could reasonably have assumed, based on her contacts with the Commonwealth, that she would be sued there. She had submitted false information on credit applications to two Virginia companies, and she had provided false information to Dun & Bradstreet in connection with its Reports on MBT, intending for Virginia businesses to rely on this information. Considering these facts, Aboud knew or should have known that she could be sued in Virginia. We therefore see the court's exercise of jurisdiction over Aboud as eminently reasonable and consistent with due process.[10]

---

[10]The fact that Aboud is a Canadian citizen does not deprive the district court of jurisdiction. While the Supreme Court, in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113 (1987), cautioned federal courts against reaching out to exercise jurisdiction over foreign entities, our national interest in foreign affairs does not outweigh ePlus's interest in obtaining relief from Aboud, or Virginia's interest in adjudicating ePlus's claims. Aboud intended to defraud Virginia corporations of substantial amounts of valuable property, and she cannot rely on the border between Canada and the United States as a shield for her illegal activities.

III.

In addition to her jurisdictional contention, Aboud maintains that she did not receive a fair trial because the court, in finding for ePlus, considered exhibits that were not admitted into evidence.[11] Indeed, in its Opinion, the court mistakenly referenced two documents that were not part of the evidentiary record. Opinion at 13 n.11. The first such document was the Trustee's Report from Gold Copy's bankruptcy proceeding, describing how Gold Copy possessed no books, no records, and no inventory when it filed for bankruptcy. It also discussed unusual transfers of money from Gold Copy to Colis-Pac and investigations by the FBI and Canadian authorities. The other document was a letter from Mr. Davis, the Trustee, to the creditors of Gold Copy and Colis-Pac. In this letter, Mr. Davis concluded that Aboud had orchestrated bust-out schemes through these companies. Overall, Mr. Davis's Report and letter (collectively, the "Trustee Documents") connect Aboud to bust-out schemes similar to the MBT scheme, and they support ePlus's claim that Aboud engaged in a pattern of racketeering activity.

Based on the mistaken reference to the Trustee Documents, Aboud moved for a new trial. Aboud insisted that the Trustee Documents prejudiced the court against her, and that the court's consideration of these documents entitled her to a new trial. In assessing this motion, the court agreed that the Trustee Documents had not been admitted into evidence, but it concluded that the testimony of Mr. Davis and other witnesses provided an alternate foundation for its factual findings and legal conclusions. On this basis, the court refused to award Aboud a new trial. *ePlus Tech., Inc. v. Aboud*, CA-00-699-A, Order, at 2-3 (E.D. Va. Jan. 11, 2002).

---

[11]On appeal, ePlus asks us to consider new material that was not in evidence. According to ePlus, after the trial was concluded, Aboud was convicted of violations of Canadian criminal law for her involvement with Gold Copy and Colis-Pac. In this regard, ePlus has moved on appeal to file "an addendum" in order to have us consider evidence of these convictions. However, ePlus has provided no authority allowing us to consider such additional evidence at this stage. We therefore deny the motion to file the addendum and do not rely on the materials therein.

Contrary to Aboud's contention, the court's fleeting reference to the Trustee Documents in its Opinion does not entitle Aboud to any relief. First, Aboud relies on authorities pertaining only to extrajudicial juror contact. In those cases, jurors (not judges) relied on information not in evidence. *See, e.g.*, *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484, 486-87 (4th Cir. 1988). Aboud provides no satisfactory explanation of how these authorities support her claim for relief here. In decisions more directly on point, we have granted a new trial "only in the most extreme of cases" where a judge demonstrated personal bias against a litigant because of reliance on extrajudicial sources. *Aiken County v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 678 (4th Cir. 1989); *see generally Crandall v. United States*, 703 F.2d 74, 75-76 (4th Cir. 1983).[12] And a court's consideration of material outside the record does not generally raise issues of constitutional magnitude. *See Aiken County*, 866 F.2d at 678 ("We do not think, however, that the two memoranda received by the judge and the ancillary *ex parte* contacts in this case approach the magnitude of constitutional error."). Similarly here, the court's mistaken citation to the Trustee Documents does not demonstrate any personal bias and does not warrant awarding Aboud a new trial.

Second, the district court's findings and conclusions do not depend on the Trustee Documents. Even where jurors rely on material not in evidence, a verdict must be sustained when such reliance is "innocuous." *Stephens*, 848 F.2d at 487. And where a court acts as fact-finder, as it did here, the judgment will be upheld where erroneous consideration of non-record material was harmless, as it was here. In this situation, Mr. Davis testified to the incriminating nature of the Gold Copy and Colis-Pac enterprises. In addition, Aboud asserted the Fifth Amendment to avoid answering any substantive questions at trial. In a civil proceeding, a fact-finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) ("[S]ilence in the face of accusation is a relevant fact not barred from evidence by

---

[12]Although courts do not generally address the standard of review applicable to assessing judicial bias, we should conduct a plenary review of such an issue because it raises due process concerns. *See Aiken County*, 866 F.2d at 678 ("Bias or prejudice on the part of a judge also can be sufficiently pervasive as to implicate due process concerns.").

the Due Process Clause."). Given this evidence, the court was entitled to conclude that Aboud used Gold Copy and Colis-Pac to operate similar bust-out schemes. Therefore, the court's reference to the Trustee Documents in a footnote of its Opinion was harmless.

IV.

Aboud next contends that she could not, as a matter of law, conspire with other MBT employees because of the intracorporate immunity doctrine.[13] On this issue, Aboud raises both issues of law, which we review de novo, and issues of fact, which we review for clear error. *See ALS Scan, Inc.*, 293 F.3d at 710.

As Aboud suggests, it is generally true that, under the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985). We have recognized, however, that the intracorporate immunity doctrine does not apply where a corporate "officer has an independent personal stake in achieving the corporation's illegal objectives." *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). In recent years, this "personal stake exception" has been limited, such that it applies only where a co-conspirator possesses a personal stake independent of his relationship to the corporation. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 705 (4th Cir. 1991).

Nevertheless, the "personal stake exception" to the intracorporate immunity doctrine plainly applies here. Aboud stood to gain from the MBT bust-out scheme, and her personal stake was wholly separate from her connection to MBT. In fact, Aboud had no interest in seeing

---

[13]In addition to maintaining that the intracorporate immunity doctrine precludes the finding of a conspiracy, Aboud insists that ePlus did not introduce sufficient evidence to establish a conspiracy. The record, however, contains ample support for the district court's ruling that Aboud was involved in a conspiracy with Akerib, Bernachawy, and Chartouni. As a result, it was appropriate to admit their statements under the co-conspirator exception to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(E); *see generally Bourjaily v. United States*, 483 U.S. 171 (1987).

MBT profit: the point of the MBT bust-out scheme was to send the corporation into bankruptcy. In siphoning money out of MBT, Aboud personally profited at MBT's expense. In such a situation, the "personal stake exception" squarely applies, and it was entirely permissible for the court to conclude that Aboud had conspired with Akerib, Bernachawy, and Chartouni.

V.

Aboud also maintains on appeal that the evidence was insufficient to support the court's fraud ruling. Aboud, of course, contends that she never personally misled ePlus in any way. Although she acknowledges that she used two names, she claims that the court made no finding that ePlus had relied on her misrepresentations. In reviewing a court's judgment for sufficiency of evidence, we review its findings of fact for clear error and its legal conclusions de novo.[14] *See Northeast Drilling, Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 37 (1st Cir. 2001); *Colonial Penn Ins. v. Market Planners Ins. Agency Inc.*, 157 F.3d 1032, 1037 (5th Cir. 1998).

In order to prevail on its fraud claim, ePlus was required to show, by clear and convincing evidence, the following elements: (1) a false representation; (2) of material fact; (3) made intentionally or knowingly; (4) with the intent to mislead; (5) reliance; and (6) resulting damages. *Richmond Metro Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 346-47 (Va. 1998). These elements may be satisfied either by a principal acting alone, or through the acts of agents. *Dudley v. Estate Life Ins. Co. of Am.*, 257 S.E.2d 871, 875 (Va. 1979) ("A principal who puts a servant or other agent in a position which enables the agent . . . to commit a fraud upon third persons is subject to liability to such third persons for the fraud.").

---

[14]On appeal, Aboud has moved to compel ePlus to comply with Rule 30(b)(2) of the Federal Rules of Appellate Procedure, which is an effort to require ePlus to pay for the Joint Appendix. She claims that ePlus designated an unjustifiably large portion of the record for inclusion in the Appendix. Because Aboud challenged the sufficiency of the evidence on the fraud and RICO claims, the evidence relating to these claims is relevant to the issues on appeal. Noting that Aboud has done little to identify any truly extraneous aspects of the Joint Appendix, we deny her motion to compel.

As the court found, there was ample evidence supporting each element of the fraud claim, without regard to the acts of Aboud's agents. Opinion at 15-17. Aboud misrepresented material facts to ePlus in seeking to establish credit for MBT. Notably, she prepared and sent ePlus a falsified credit application, on which Aboud lied about MBT's non-existent factory, the number of its employees, and her identity. As part of the scheme, Aboud also submitted false information to Dun & Bradstreet. The court found that "[a]ll of these fraudulent acts and representations were done to induce reliance on the part of plaintiff in furtherance of Aboud's bust out conspiracy scheme." *Id.* at 6; *see also id.* at 17. Furthermore, ePlus relied on these misrepresentations and lost money on goods it shipped to MBT. On this evidence, the court was entitled to conclude that ePlus had proven the elements of its fraud claim.

## VI.

Finally, Aboud maintains that ePlus failed to establish the "pattern of racketeering activity" necessary to prevail on its civil RICO claim. 18 U.S.C. § 1961(1), (5). Aboud suggests that the losses suffered by ePlus resulted from an ordinary business debt, which does not normally lead to RICO liability. She maintains that ePlus did not establish that the Gold Copy and Colis-Pac enterprises were sufficiently similar to the MBT scheme for RICO to apply, and that the MBT scheme was too circumscribed to warrant the imposition of RICO liability. Since Aboud has challenged the sufficiency of the evidence on this issue, we review the court's factual findings for clear error and its legal conclusions de novo. *See Northeast Drilling, Inc.*, 243 F.3d at 37; *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 170 (3d Cir. 1991).

## A.

In order to prevail on its RICO claim, ePlus was required to prove that Aboud had engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962; *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232-33 (1989). Under RICO, "racketeering activity" is defined as "any act or threat" involving specified state law crimes, such as murder or bribery, or an "act" indictable under various federal statutes, such as mail and wire fraud. 18 U.S.C. § 1961(1). To have a "pattern"

of such activity, two or more predicate acts of racketeering must have been committed within a ten year period. *Id.* § 1961(5). These requirements are designed to prevent RICO's harsh sanctions, such as treble damages, from being applied to garden-variety fraud schemes. *See H.J. Inc.*, 492 U.S. at 233; *see also Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989) ("The pattern requirement in § 1961(5) thus acts to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions.").

1.

The first question we must address is whether, on this evidence, Aboud engaged in racketeering activity. Because the statutory definition of racketeering activity does not include common law fraud, such activity must be predicated on violations of the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343. In order to prove that Aboud committed mail or wire fraud, ePlus needed to show (1) a scheme to defraud and (2) use of a mail or wire communication in furtherance of that scheme. *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995). As the court found, the fraudulent credit applications sent by Aboud to MBT's suppliers, and the telephone conversations between MBT employees and its creditors, violated the wire fraud statute. Opinion at 19. Similarly, the phony checks mailed to ePlus by MBT representatives qualify as separate acts of mail fraud. *See United States v. Murr*, 681 F.2d 246, 248-49 (4th Cir. 1982). Therefore, ePlus plainly established the required acts of "racketeering activity." 18 U.S.C. § 1961(1).[15]

2.

We must next assess whether, under the evidence adduced, RICO's pattern requirement has been satisfied. To establish such a pattern, "a plaintiff . . . must show that the racketeering predicates are *related*,

---

[15]We have cautioned against imposing civil RICO liability for garden-variety violations of the mail and wire fraud statutes "because it will be the unusual fraud that does not enlist the mails and wires in its services at least twice." *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). As the district court recognized, however, the scheme in this case represents more than run-of-the-mill fraud. Opinion at 19-21.

*and* that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first and third emphasis added). In essence, the pattern requirement has been reduced to a "continuity plus relationship" test. *Id.* As we have observed, there is no mechanical formula to assess whether the pattern requirement has been satisfied; it is a commonsensical, fact-specific inquiry. *Id.* at 237-38, 242; *Anderson v. Found. for Advancement, Educ., and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) ("These criteria are not always easily applied and depend on the facts of each particular case."); *Int'l Data Bank, Ltd. v Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987) (noting that "no mechanical test can determine the existence of a RICO pattern").

In its decision in *H.J. Inc.*, the Supreme Court addressed the "continuity plus relationship" test. For the predicate acts to be related, they must have "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and [not be] isolated events.'" *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). The continuity aspect, in turn, refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Significantly, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242. Thus, it is clear that predicate acts of racketeering activity must be part of a prolonged criminal endeavor.

B.

While the predicate acts of mail and wire fraud in this case relate to each other, it is less clear whether ePlus established the necessary continuity. The MBT bust-out scheme lasted only a few months, and its fraudulent activity centered around MBT, its credit rating, and its bankruptcy. Simply put, the fact that the MBT scheme and its underlying conspiracy victimized numerous creditors does not necessarily establish the requisite pattern of racketeering activity. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) ("*GE Investment*"). In *GE Investment*, insiders, similar to the MBT schemers, were engaged in a scheme "to defraud potential

investors and plaintiffs by misleading them into believing that [the company] was a thriving, financially successful business." *Id.* (internal quotes omitted). Even where many investors had been misled, we concluded that the required continuity had not been established.

If the MBT bust-out scheme had operated over a longer period or employed a variety of predicate offenses, it might have involved the required pattern of racketeering activity. *See H.J. Inc.*, 492 U.S. at 237 (rejecting idea that RICO must involve more than one scheme); *Morley v. Cohen*, 888 F.2d 1006, 1010 (4th Cir. 1989) (finding requisite continuity from single scheme where predicate offenses continued for nearly five years); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1279 (7th Cir. 1989) (finding necessary continuity where bust-out scheme involved many different types of predicate offenses). However, a bust-out scheme does not easily support RICO liability because it has a built-in ending. For such a scheme to succeed, the corporation must go bankrupt. *See GE Inv.*, 247 F.3d at 549 ("Where the fraudulent conduct is part of the sale of a single enterprise, the fraud has a built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity.").

In any event, Aboud was involved in other credit scams, and we need not decide whether the MBT scheme, standing alone, would sufficiently establish a pattern of racketeering activity. At trial, Mr. Davis — the Trustee who handled the bankruptcies of Colis-Pac, Gold Copy and MBT — demonstrated that Aboud was involved with other, similar bust-out schemes. In particular, he testified that Gold Copy and Colis-Pac went into bankruptcy under circumstances similar to those surrounding the MBT bankruptcy. Indeed, he found empty warehouses, no assets, and no records when he assumed control of each of the three companies. Of all of the businesses, Gold Copy had the most significant remnants of a folded business: in its warehouse, Mr. Davis found an orange juice container and damaged reams of paper. Furthermore, he described an eerily similar scene at each of the corporate offices. The same individuals — Aboud, Bernachawy, and Akerib (the schemers) — would be sitting in an office with empty file cabinets. And they were consistently hostile and recalcitrant — refusing to cooperate with Mr. Davis — when he asked about the absence of business records.

According to Mr. Davis, all three businesses engaged in unusual and similar transactions involving large sums of money. For inexplicable reasons, Aboud cashed a check written to Gold Copy in the amount of $137,000, and Gold Copy issued a check to Colis-Pac in excess of $400,000. In addition to the money it transferred to Aboud and Colis-Pac, Gold Copy wrote large checks, totaling more than $500,000, to Aboud's father, to a loan shark, to the company bookkeeper, and to other individuals — all without any business justification. In general, Mr. Davis testified to locating "a trail of checks going from one company to the other . . . with checks going back and forth from each company for large amounts." He also testified about several inexplicable transfers of MBT property. For example, Aboud cashed checks written to MBT worth more than $1.3 million.[16] Mr. Davis considered such a state of affairs to be "strange" for businesses that file for bankruptcy.

From Mr. Davis's testimony, the court was entitled to conclude that Aboud had operated similar bust-out schemes through Gold Copy and Colis-Pac. Bust-out schemes typically involve the modus operandi discussed by Mr. Davis, including the utilization of unusual monetary transfers between corporate and personal accounts. *See United States v. Mohammed*, 53 F.3d 1426, 1430-31 (7th Cir. 1995) (concluding from unusual transfers of money that defendants operated bust-out scheme); *see also Ashland Oil, Inc.*, 875 F.2d at 1275 (same). Similarly, when conspirators have used a corporate entity to conduct a bust-out scheme, they usually leave the corporation without assets or records when it files for bankruptcy. *See id.* Finally, Mr. Davis established the unmistakeable and fraudulent affiliations between Gold Copy, Colis-Pac, MBT, and Olympique Transport. *See United States v. Hewes*, 729 F.2d 1302, 1311 (11th Cir. 1984) ("The jury's conclusion . . . is bolstered by the network of mutual, fraudulent credit references that existed among and helped support the various bustout companies."). With this evidence, the district court was entitled to

---

[16]With respect to the checks written to MBT and cashed by Aboud, Mr. Davis testified: "[T]here were too many to photocopy, but I saw the checks. I made sure I saw them. They were signed by Patricia. They were payable either to cash, endorsed by Patricia Aboud, or payable to Patricia Aboud."

conclude that Aboud had used Gold Copy and Colis-Pac to conduct separate credit scams similar to her MBT bust-out scheme.

Finally, Aboud's assertion of her Fifth Amendment privilege provides additional, and quite substantial, support for the determination that Aboud engaged in a pattern of racketeering activity. *See Baxter*, 425 U.S. at 317-18. Simply put, the court was entitled to premise its finding of a pattern of racketeering activity on the evidence, particularly Mr. Davis's testimony and the adverse inferences it was entitled to draw from Aboud's assertion of the Fifth Amendment.

## VII.

Pursuant to the foregoing, we affirm the district court's judgment in favor of ePlus on its fraud and civil RICO claims.

*AFFIRMED*