MARKETING PRODUCTS
MANAGEMENT, LLC and
Chris Lundin, Plaintiffs,

v.

HEALTHANDBEAUTYDIRECT.COM,
INC., Venture Cycle, LLC, VI Holdings, Inc., DMSG Holdings, Inc., Venture Media Limited Partnership, Ventech, Inc., and Brian Fraidin, Defendants.

Civ. No. AMD 03–3064.

United States District Court,
D. Maryland.

Sept. 7, 2004.

---

JoAnne Zawitoski, Alexander M. Giles, Robert Leigh Hebb, Semmes Bowen and Semmes PC, Baltimore, MD, for Plaintiffs.

Lisa Crowley DeLessio, William C. Davis, III, Shulman Rogers Gandal Pordy and Ecker PA, Rockville, MD, for Defendants.

T. Christine Pham, Rosenberg Martin Funk Greenberg LLP, Baltimore, MD, for Consolidated Counter–Claimants.

## MEMORANDUM OPINION

DAVIS, District Judge.

Plaintiffs, Marketing Products Management, LLC ("MPM") and Christopher Lundin, have instituted two federal claims and numerous state law claims against Brian Fraidin and several of the entities Fraidin controls: Healthandbeautydirect.com, Inc. ("HBD"), Venture Cycle, LLC ("Venture Cycle"), VI Holdings, Inc., DMSG Holdings, Inc. ("DMSG"), Venture Media Limited Partnership ("Venture Media"), and Ventech, Inc. ("Ventech"). Complete diversity of citizenship is absent. The two federal claims alleged by plaintiffs are said to arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). All of plaintiffs' claims grow out of disputes over an agreement entered into by HealthandBeautyDirect, Inc. (a predecessor of defendant Healthandbeautydirect.com, Inc.), and MPM to market the LandRider, a bicycle with patented technology allowing the bike's gears to shift automatically.

Now before the court are defendants' motions to dismiss. The motions have been fully briefed and a hearing has been held. For the reasons stated herein, the motions shall be granted as to the two federal claims, and the state law claims shall be dismissed for lack of jurisdiction.

## I.

The applicable standard for the review of a complaint challenged by a motion to

dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is well settled:

> A Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

*Migdal v. Rowe Price–Fleming Int'l, Inc.*, 248 F.3d 321, 325–26 (4th Cir.2001). It is also important to be mindful, however, that the defendants are entitled to have the *legal sufficiency* of the complaint fully examined and that, although the truth of all facts is assumed, consistent with the complaint's allegations, *see Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the court need not accept the legal conclusions drawn from the facts, *see Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991), or unwarranted inferences, unreasonable conclusions, or arguments. *See generally* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 1357 (2d ed.1990 & 2004 Supp.).

## II.

The following events state the basis of plaintiffs' claims. Of course, the factual allegations of the amended complaint are viewed (and any inferences from them are drawn) in the light most favorable to plaintiffs.

### The Parties

Plaintiff MPM is a Delaware limited liability company with its principal place of business in Maryland. Am. Compl. (Hereinafter "Compl.") ¶ 2. Plaintiff Chris Lundin, the sole managing member of MPM, resides in Delaware. *Id.* Defendants HBD, Venture Cycle, VI Holdings, DMSG, and Ventech are Delaware corporations with principal places of business in Maryland. *Id.* ¶¶ 3–8. Venture Media is a Maryland limited partnership with its principal place of business in Maryland. *Id.* ¶ 7.

HBD, VI Holdings, DMSG, and Venture Media were engaged in the business of marketing products through "direct response advertising." *Id.* ¶¶ 3, 5–7. Fraidin created Venture Cycle in consequence of his dealings with plaintiffs to develop a parent brand name for the LandRider, limit HBD's liability for potential product liability claims from LandRider sales, accept LandRider sales revenues and facilitate LandRider accounting. *Id.* ¶ 4. Ventech was the largest shareholder in HBD. *Id.* ¶ 8. Fraidin controls each of these entities. *Id.* ¶ 9.

MPM was in the business of acquiring products and, like the defendants, marketing them through "infomercials." *Id.* ¶ 12.[1] In or about June 2000, Lundin ac-

---

1. Judge Haight has described an "infomercial" as follows:

    An "infomercial" is a half-hour long television program which starts out looking like a real program, but is in effect an extended commercial for a product or product line. These presentations contain no info and a great deal of mercial. A steady diet of infomercials is equivalent to life in the Fifth Ring of Hell.

    *Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.*, 820 F.Supp. 763, 772 (S.D.N.Y.1993).

quired the exclusive rights to make and sell the LandRider. *Id.* ¶ 13. Lundin worked with the inventor to design and to obtain patents for the product. He spent $150,000 and 18 months in uncompensated time on development of the LandRider. *Id.*

*The Agreement*

In October 2000, Fraidin, acting on behalf of HBD, responded to MPM's search for a joint venture partner to market and sell the LandRider on a world-wide basis. *Id.* ¶ 14. During the negotiations over an agreement, HBD, through Fraidin, made the following allegedly false representations by telephone, electronic mail and facsimile transmission:

- HBD was partnered with major national and international media outlets enabling HBD to advertise products via television and print ads at deeply discounted rates;

- Sinclair Broadcasting Group was an investor in HBD, providing HBD with the necessary financial backing to market the LandRider nationally and internationally; and

- John Schulberg, a well-known infomercial producer, was a member of HBD's management team.

*Id.* ¶ 16.

Effective as of January 1, 2001, MPM and HBD entered into a so-called "Consulting Agreement" (hereinafter, "the Agreement"). Pursuant to the Agreement, MPM agreed to assign its right to source, manufacture, market, and sell the LandRider, and to provide consulting ser-

vices to HBD in connection with product sourcing, development, production, and marketing of the LandRider. *Id.* ¶ 18. In consideration for the assignment and MPM's consulting services, HBD agreed to pay compensation to MPM during the terms of the Agreement, to include: (1) specific monthly fees; (2) expense reimbursement; (3) 20% of direct operating profit; and (4) 20% of net purchase proceeds in the event of sale of all or substantially all of the assets, stock, or ownership in the LandRider. *Id.* ¶¶ 20–21. In accordance with these terms, HBD would provide MPM with a quarterly accounting of LandRider sales. *Id.* ¶ 33.[2]

The initial nine-month term of the Agreement expired on September 30, 2001; a subsequent three-month term expired on December 31, 2001. *Id.* ¶ 24. Meanwhile, on or about October 31, 2001, HBD and Fraidin advised MPM and Lundin that HBD would renew the Agreement for a third term only if Lundin agreed either to accept part-time employment with HBD in exchange for a sharply reduced monthly compensation, or, alternatively, only if MPM agreed to reduce its 20% equity participation.[3] *Id.* ¶ 25. Ultimately, the Agreement terminated. *Id.* ¶ 27. MPM received no additional profit participation or quarterly accountings. *Id.* ¶ 28.

*The Infomercial*

In or about January 2001, Lundin participated in the creation of, and appeared in, a LandRider infomercial. *Id.* ¶ 43. After the termination of the Agreement, HBD produced another infomercial, apparently an edited version of the original.[4]

---

**2.** The Agreement also provided that if HBD terminated the Agreement for any reason other than cause or declined to renew it at the end of any term or breach, then MPM's profit participation would survive the termination. Compl. ¶ 26.

**3.** "Equity Compensation ... is defined as a percentage of net purchase proceeds in the event of a sale of all or substantially all of the assets of, or a majority interest in the stock or equity ownership of the Bike Product." Comp. ¶ 25.

**4.** During the hearing, plaintiffs clarified that

The infomercial identifies Lundin as a "member of the Design team" for Venture Cycle and depicts him wearing a Venture Cycle t-shirt. *Id.* There were no separate negotiations over Lundin's appearance in the infomercial, and he signed no writing governing his appearance in the infomercial or HBD's future use of the infomercial. Nevertheless, Lundin alleges that his "reasonable expectation was that his likeness would only be used as long as he was employed and compensated as a [HBD consultant] pursuant to the Agreement." *Id.* Once the Agreement terminated, Lundin repeatedly—and unsuccessfully—requested that HBD and Fraidin edit Lundin out of the infomercial. *Id.* ¶ 45. The infomercial was still being broadcast at the time the amended complaint was filed. *Id.*

*Predicate Acts*

In purporting to allege a RICO claim, plaintiffs have included in the amended complaint the following description of alleged "fraudulent misrepresentations" made by Fraidin to non-parties to this case:

*(1) The Schulberg Matter*

In or around November 1, 1999, Fraidin induced Jon Schulberg, the principal of Schulberg Media Works, Inc. (collectively, "Schulberg"), to produce infomercials for Fraidin's businesses at or below cost and to provide marketing to HBD in exchange for a position on HBD's management team and stock options in HBD. He also repre-

sented that HBD would soon become a publicly traded company. *Id.* ¶ 47. Fraidin also told Schulberg that HBD had partnered with Sinclair Broadcasting Group, Inc., and that Sinclair had agreed to give HBD preferential rates for the airing of all infomercials, which would result in greater profit distribution to Schulberg. *Id.* MPM alleges that these statements were false and misleading when made and were intended to induce Schulberg to rely on them to his detriment. *Id.* ¶ 48. Schulberg produced infomercials, including a LandRider infomercial, but Fraidin did not compensate him. *Id.* ¶ 50. MPM alleges that Fraidin then "marketed" industry leaders Schulberg and Nick Cirmo to Lundin and others as shareholders and members of HBD so that Fraidin could trade on Schulberg's industry status when in fact Schulberg had no affiliation with HBD. *Id.* ¶ 49.[5]

*(2) The MRSG Holdings/Quantum Companies Matter*

In 2001, Fraidin, through VI Holdings, purchased the assets of a bankrupt direct marketing company, E4L, Inc. *Id.* ¶ 51. The purchased assets included equity in a group of marketing companies in the Asian Pacific Rim (hereinafter the "Quantum Companies"). The Quantum Companies held the rights to sell and distribute valuable product lines. In order to obtain the necessary support of the Quantum Companies management team and, in turn, the

two infomercials were produced prior to the termination of the Agreement and a third was produced after the Agreement terminated, apparently employing edited material depicting Lundin's appearance in the earlier infomercials. It is this third, later-produced infomercial on which plaintiffs rely as the basis of their claim under the Lanham Act. My analysis of the Lanham Act claim does not hinge on the date of production of any of the infomercials. *See infra* pp. 20–28.

**5.** In *Healthandbeautydirect.com, Inc. v. Jon Schulberg,* Civil Action No. RWT 03–3665 (D.Md.), Fraidin and Schulberg are in litigation over some of the issues which plaintiffs seek to import into this case. In a Memorandum Opinion and Order filed on September 1, 2004, Judge Titus granted Fraidin's motion to dismiss under Fed.R.Civ.P. 12(b)(6) and dismissed the RICO claim Schulberg had asserted as a part of his counterclaim in that case.

bankruptcy court's approval of the purchase, Fraidin represented to the Quantum Companies that he would, *inter alia*, (1) keep the Quantum management team intact; (2) provide/facilitate a line of credit to the Quantum Companies to finance inventory purchasing; and (3) give the management team a 20% ownership interest in VI Holdings, legal title of which would be held in the name of a newly-formed entity, MRSG Holdings, Inc. *Id.* Fraidin also told the management team that Sinclair was a partner and investor in Fraidin's companies, and that this would give the Quantum Companies financial strength and market acceptance, and that Schulberg and Lundin were partners and members of MRSG Holdings' senior management group. *Id.*

These representations allegedly led the Quantum Companies management team to support the proposed stock purchase to their detriment. *Id.* ¶ 53. Once the stock purchase was approved, Fraidin forwarded $4.8 million of the Quantum Companies' funds to VI Holdings, of which only $2.5 million was used to pay debt service on the loan used to buy the Quantum Companies stock. The loan is now in default. *Id.* ¶ 54.

Fraidin used the Quantum Companies' resources to obtain foreign distribution rights for, and to market, the LandRider in Asia. In November 2002, Fraidin directed a Quantum Companies representative to issue revised purchase orders for the LandRider to make it appear that the cost of the bikes was $125 per bike instead of the actual per bike price of $110. *Id.* ¶ 55. In May 2003, Fraidin removed two directors and officers from the Quantum Companies board and ultimately forced them to resign because "they refused to

execute a Quantum Companies guaranty to an amendment to the [loan used to purchase Quantum Companies stock], unless Fraidin produced the entire proposed amendment." *Id.* ¶ 56.

### (3) *The MotorUp Matter*

MotorUp Corporation, a Pennsylvania corporation, is engaged in the sale, promotion, marketing, and distribution of a new and original engine oil additive known as MotorUp. *Id.* ¶ 57. *Plaintiffs allege that MotorUp Corporation alleges* that it entered into an exclusive distributorship arrangement with E4L, Inc., in 1999, to which Fraidin obtained rights when he acquired the Quantum Companies.[6] Plaintiffs further allege, "on information and belief," that MotorUp terminated the agreement in November 2001. *Id.* ¶ 60. Nonetheless, Fraidin caused MotorUp products to be sold in Japan. *Id.* ¶ 61. Revenues from these sales were used to fund HBD, Venture Media and Ventech, Inc. *Id.* ¶ 62.

### III.

The issue presented is whether the allegations summarized above are sufficient, drawing all reasonable inferences in favor of plaintiffs, to state cognizable claims under RICO and the Lanham Act. I address each statutory claim in turn.

### RICO

Manifestly, plaintiffs have failed to state a cognizable RICO claim against Brian Fraidin—the only defendant named in the RICO count. Specifically, the amended complaint does not allege facts that would if true establish that Fraidin engaged in a "pattern of racketeering activity" com-

---

**6.** While plaintiffs seem to acknowledge that they have no standing to assert as a ground for relief wrongs done by Fraidin to others, it is nevertheless remarkable that, even under the encompassing scope of a genuine RICO claim, *they boldly allege the allegations of others as a basis for their claims.*

prised of mail and wire fraud violations, as required under RICO.

Under RICO, a party may bring a civil cause of action when "injured in his business or property by reason of violation of section 1962." 18 U.S.C. § 1964(c). Section 1962 makes it unlawful for "any person employed by or associated with any enterprise engaged in, . . . interstate or foreign commerce to conduct or participate in . . . a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activities" are statutorily defined offenses, including mail and wire fraud. 18 U.S.C. § 1961(1). *See also Beck v. Prupis,* 529 U.S. 494, 497 n. 2, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). A "pattern of racketeering activity" requires *"at least* two acts of racketeering activity, one of which occurred [after the adoption of the provision], and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering." 18 U.S.C. § 1961(5) (emphasis added). RICO's requirement that the predicate acts constitute a pattern

> ensure[s] that RICO's extraordinary remedy does not threaten the ordinary run of commercial damages; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted.

*Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir.1989).

Thus, while two acts are necessary to give rise to a civil action, something "beyond simply the number of predicate acts is involved." *H.J., Inc. v. Northwestern Bell Tel. Company,* 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also id.* at 237, 109 S.Ct. 2893 ("In our view, Congress had a more natural and commonsense approach to RICO's pattern

element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity.").

In short, facts indicative of both "relatedness" among the predicate acts said to constitute the "pattern of racketeering activity" and the "continuity" of such acts must appear in a complaint asserting a cognizable RICO claim under 18 U.S.C. § 1964(c): "[A] plaintiff must allege a continuing pattern and a relationship among the defendant's activities by showing they had the same or similar purposes." *Anderson v. Foundation for Advancement, Education and Employment of American Indians,* 155 F.3d 500, 505 (4th Cir.1998) (citing *H.J., Inc.*).

In the Fourth Circuit, "relatedness" is a fact-based inquiry and is evidenced where acts "have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *See id.* at 505–06. Significantly, where the predicate acts involved are mail and wire fraud, courts are to be especially cautious and are to look for more than just two or more acts as "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Id.* at 506 (citing *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987)).

More recently, Judge Harvey comprehensively summed up the controlling principles in this area of the law, with special emphasis on RICO claims based, as here, on allegations of mail and wire fraud, as follows:

For many years, the Fourth Circuit has taken a somewhat restrictive view of RICO actions based on ordinary claims of fraud. What constitutes a RICO pattern of racketeering has been held by the Fourth Circuit to be a matter of criminal dimension and degree. *International Data Bank Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987). The Fourth Circuit has pointed out that it was Congress' intent that RICO "serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Id.* In *HMK Corp. v. Walsey,* 828 F.2d 1071, 1074 (4th Cir.1987), the Fourth Circuit emphasized that the heightened civil penalties of RICO "are reserved for schemes whose scope and persistence set them above the routine."

In providing a remedy of treble damages for injury caused by a violation of RICO's substantive provisions, Congress contemplated that "only a party engaging in widespread fraud would be subject to such serious consequences." *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir.1989). The pattern requirement in § 1961(5) acts to insure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions. *Id.* Treble damage suits therefore may not be brought against isolated offenders for their harassment and settlement value. *Id.* Multiple state laws bearing on commercial transactions are not to be eclipsed or preempted by RICO. *Id.*

The Fourth Circuit has been particularly cautious "about basing a RICO claim on predicate acts of mail and wire fraud ..." *Al–Abood v. El–Shamari,* 217 F.3d 225, 238 (4th Cir.2000). Quoting *Anderson v. Foundation for Advancement, Educ. and Employment of Am. Indians,* 155 F.3d 500, 506 (4th Cir. 1998), the Fourth Circuit in *Al–Abood*

stated that "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Id.* at 238. The Court emphasized that its caution in such cases "is designed to preserve a distinction between ordinary or garden variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Id.* Citing *Menasco,* the Court in *Al–Abood* reiterated that it had reserved RICO liability for ongoing, unlawful activities whose scope and persistence pose a special threat to social well-being. *Id.*

Very recently, Chief Judge Smalkin of this Court relied on *Menasco* and *Al– Abood* in dismissing a RICO claim. *Lowry's Reports, Inc. v. Legg Mason, Inc.,* 186 F.Supp.2d 592, 593 (D.Md. 2002). Citing *GE Inv. Private Placement Partners v. Parker,* 247 F.3d 543, 549 (4th Cir.2001), Chief Judge Smalkin held that the fact that an alleged RICO scheme based on mail or wire fraud will usually involve a number of separate uses of means of interstate commerce does not alone establish the requisite pattern of racketeering activity. *Id.* at 593. Relying on Fourth Circuit pronouncements which require district courts to take "a common sense approach to the scope of RICO," the RICO claim asserted by plaintiff in *Lowry's Reports* was dismissed. *Id.* at 594. *See also Howard Oaks, Inc. v. Md. Nat'l Bank,* 810 F.Supp. 674, 678 (D.Md.1993). *Maryland–National Capital Park and Planning Com'n. v. Boyle,* 203 F.Supp.2d 468, 476 (D.Md.2002), *aff'd,* 63 Fed.Appx. 98 (4th Cir.2003).

■ Conscientious application of the above principles to the facts alleged in the amended complaint yields only one result. The ostensible predicate acts alleged by plaintiffs here are not sufficiently related to satisfy the pleading requirements of a

claim under RICO, and especially is this so considering that the underlying predicate acts are limited to wire fraud and mail fraud.

Although Fraidin was involved in all of the alleged predicate acts, and although he may have used one or more of his companies in carrying out one or more of the alleged acts, the acts and transactions alleged here simply are not otherwise connected. Plaintiffs accuse Fraidin of employing a "similar and related *confidence* scheme" to defraud several victims (i.e., MPM, Schulberg, the Quantum Companies, and MotorUp) of "intellectual property rights, money, the 'intangible right to honest services,' and other valuable property rights" in connection with his overarching aim, which was "to further his . . . scheme to acquire complete control over the technology, marketing, distribution and sale of the LandRider Bike." *See* Pl. Supp. Opp'n to Mot. to Dismiss at 6, 11.

But plaintiffs paint with too broad a brush. In giving the meaning of "pattern of racketeering activity" what plaintiffs describe as a "broad" interpretation, the Supreme Court did not set out to untether RICO from Congress' animating concerns. It must be recalled that the Court's specific holding in *H.J., Inc.* was to reject the Eighth Circuit's narrow rule "that predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes." 492 U.S. at 236, 109 S.Ct. 2893. Indeed, in *H.J., Inc.*, in a closely related context, Justice Brennan wisely warned courts away from an approach to the interpretation of RICO elements at too high a "level of generality:"

Nor does the multiple scheme approach to identifying continuing criminal conduct have the advantage of lessening the uncertainty inherent in RICO's pattern component, for "'scheme' is hardly a self-defining term." *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d, at 39. A "scheme" is in the eye of the beholder, since whether a scheme exists depends on the level of generality at which criminal activity is viewed. For example, petitioners' allegation that Northwestern Bell attempted to subvert public utility commissioners who would be voting on the company's rates might be described as a single scheme to obtain a favorable rate, or as multiple schemes to obtain favorable votes from individual commissioners on the rate-making decision. Similarly, though interference with ratemaking spanning several ratemaking decisions might be thought of as a single scheme with advantageous rates as its objective, each ratemaking decision might equally plausibly be regarded as distinct and the object of its own "scheme." There is no obviously "correct" level of generality for courts to use in describing the criminal activity alleged in RICO litigation. Because of this problem of generalizability, the Eighth Circuit's "scheme" concept is highly elastic. Though the definitional problems that arise in interpreting RICO's pattern requirement inevitably lead to uncertainty regarding the statute's scope—whatever approach is adopted—we prefer to confront these problems directly, not "by introducing a new and perhaps more amorphous concept into the analysis" that has no basis in text or legislative history.

*Id.* at 241 n. 3, 109 S.Ct. 2893.

Accordingly, viewed through the prism of the Supreme Court's reasoning in *H.J., Inc.,* plaintiffs' expansive characterization of the discrete acts comprising Fraidin's transactions with the alleged victims identified here as part of a "confidence scheme" whose purpose was to enable Fraidin to arrogate to himself the interna-

tional market for LandRider bikes is more an exercise in "labeling" than a forthright and substantive analysis of the facts alleged in the amended complaint and an application of law to the alleged facts. Undeniably, the amended complaint describes virtually every instance of modern commercial fraud, involving as they must the use of interstate wire and mail communications. Such "garden variety" commercial fraud is hardly described accurately as a "*modus operandi.*" Rather, even as elaborately alleged in the amended complaint, the described predicate acts are, fundamentally, no more than sketches of unrelated, or only tenuously-related, commercial disputes arising out of Fraidin's international marketing businesses. That is, in every meaningful sense, they are "routine" allegations of "fraud in the inducement," a longstanding fount of state tort law beyond the intended scope of RICO. *See Boyle,* 203 F.Supp.2d at 475–76 ("[T]he heightened civil penalties of RICO 'are reserved for schemes whose scope and persistence set them above the routine.'") (quoting *HMK Corp. v. Walsey,* 828 F.2d 1071, 1074 (4th Cir.1987)).

The foregoing analysis is borne out by plaintiffs' inability to marshal any case law support for their novel application of RICO to the allegations made in the amended complaint. For example, plaintiffs cite *ePlus Technology, Inc. v. Aboud,* 313 F.3d 166 (4th Cir.2002), for the proposition that the "pattern" requirement is satisfied as long as a RICO plaintiff alleges that defendants used similar fraudulent schemes to defraud "other" victims. *Aboud* is patently dissimilar to the case at bar, however.

*Aboud* involved a series of so-called "bust-out" schemes. "In a typical bust-out scheme, promoters form a seemingly legitimate corporation. At the outset of the scheme, the corporation's bills are paid, and its creditors are lured into extending larger and larger lines of credit. The schemers then use these inflated credit lines to obtain merchandise from suppliers, sell the merchandise at fire sale prices, and loot the corporation of its assets. Ultimately, the debtor corporation files for bankruptcy, and creditors can lose millions from unpaid and uncollectible debts. *See United States v. Crockett,* 534 F.2d 589, 592 (5th Cir.1976) (describing typical bust-out scheme)." *Id.* at 170–71. The Court noted in *Aboud* that "a bust-out scheme does not easily support RICO liability because it has a built-in ending. For such a scheme to succeed, the corporation must go bankrupt." *See GE Inv.,* 247 F.3d at 549 ("Where the fraudulent conduct is part of the sale of a single enterprise, the fraud has a built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity.")." *Id.* at 182.

Ultimately, the Court sustained the judgment in favor of plaintiff under RICO on the ground that the trial evidence had demonstrated that the defendant had engaged in at least *three* bust-out schemes, each involving the same *modis operandi,* each involving numerous victims, and each concluding with an abandoned, asset-less corporate shell left behind by the schemers. *Id.* at 182–84.

*Aboud* provides no help to plaintiffs here. In particular, although Fraidin made allegedly false representations to Schulberg to induce him to produce infomercials for HBD, those false representations are not in any *relevant* way related to Lundin's claim of fraud in the inducement, based on alleged misrepresentations made well after any misrepresentations had been made to Schulberg. Compl. ¶¶ 47–49. The only common element of these two "confidence schemes" is that in each instance, Fraidin allegedly lied to

Schulberg and Lundin about the identity of his partners and his wealth in an effort to induce them to enter into agreements with one or more of his companies. If relationships this thin between discrete frauds were sufficient to satisfy RICO's pattern requirement, every state law fraud claim would be converted into a RICO cause of action, a result forbidden by long-standing Fourth Circuit precedent. *E.g., HMK Corp. v. Walsey*, 828 F.2d 1071, 1074 (4th Cir.1987).

The other "predicate acts" are even more tenuously related to Lundin's dispute with Fraidin or to Fraidin's dispute with Schulberg and are plainly insufficient to establish a "pattern of racketeering activity" under RICO. The amended complaint alleges that the Quantum Companies were fraudulently acquired by Fraidin and used as vehicles to conceal profits earned from the LandRider bicycle sales. Compl. ¶ 54. Again, however, there is no allegation that the Quantum Companies were acquired *for the purpose of defrauding plaintiffs* or that their acquisition or use in any way was connected to any injury suffered by the plaintiffs in consequence of the alleged breach of the Agreement, which is the core issue presented in this case.

Finally, plaintiffs do not even attempt to connect the MotorUp matter to the LandRider claims, other than to assert, at the highest level of generality imaginable, that in each instance, Fraidin attempted to defraud "victims out of money, intellectual property rights and assets." *See* Pl. Opp'n to Mot. to Dismiss at 13. In fact, the MotorUp allegations do not even involve a "confidence scheme," but, as Judge Titus noted recently in dismissing RICO claims brought by Schulberg against Fraidin, "while the MotorUp matter may constitute commercial fraud, it does not support a 'pattern of racketeering activity.'" *Healthandbeautydirect.com, Inc. v. Jon Schul-*

*berg,* Civil Action No. RWT 03–3665, 2004 WL 2005783, Slip Op. at 7 (D.Md. Sept. 1, 2004).

None of the other principal cases on which plaintiffs rely for their expansive conception of a RICO "pattern of racketeering activity" lend support to plaintiffs. In *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130 (4th Cir.1993), the Court reversed the dismissal of a RICO claim based on allegations of *bribery.* The Court specifically declined to consider whether the mail and wire fraud claims were sufficient to state a claim under RICO. *Id.* at 1136–37. Thus, *Mylan Laboratories* is not relevant to the determination of whether the mail fraud and wire fraud "predicate acts" alleged in the amended complaint are sufficient to support the existence of a "pattern of racketeering activity" here.

Plaintiffs' reliance on *Superior Bank v. Tandem National Mortgage, Inc.,* 197 F.Supp.2d 298 (D.Md.2000), is similarly misplaced. In *Superior Bank,* numerous defendants involved in the real estate industry (including mortgage brokers, title companies, and property appraisers) allegedly engaged in a scheme to induce the plaintiff to purchase 23 mortgage loans at fraudulently inflated prices on the secondary market. *Id.* at 307. In denying motions to dismiss, Judge Garbis reasoned that the "relatedness" requirement was satisfied because, drawing all inferences in favor of the plaintiff's allegations, the defendants' actions were aimed at a single victim with the express purpose of inducing the victim (and perhaps other mortgage loan purchasers) to buy the loans, and that the schemer/mortgage brokers, *which were in privity with the plaintiff purchaser,* used the same title companies and property appraisers, each of whom employed the same means (e.g., falsely-made documents and inflated appraisals)

to effectuate the fraud. *Id.* at 323–24. In contrast, here, the amended complaint alleges three different series of fraudulent representations, that injured three different non-parties, for three different express purposes. Although, viewed expansively, two of the acts—the Schulberg matter and the MPM matter—were connected to the LandRider bike, unlike the scheme in *Superior Bank*, the acts here did not involve a singular purpose. Reliance on a "similarity of purpose" at the level of generality urged by plaintiffs, e.g., simply to "get rich quick," or "to corner the market" in some product, would denigrate the pointed efforts of the Supreme Court and the Fourth Circuit to harmonize RICO claims with "routine" cases of fraud. *See, e.g., Menasco*, 886 F.2d at 683.

Finally, *Toucheque v. Price Brothers Co.*, 5 F.Supp.2d 341 (D.Md.1998), does not support a ruling in favor of plaintiffs. In *Toucheque*, Judge Young denied the motion to dismiss the RICO claim and concluded that the "relatedness" requirement was met because the predicate acts were directed at the *"same individual by the same defendants using the same extortionate methods continuously for three years."* *Id.* at 346 (emphasis added). Clearly, as discussed *supra*, that level of "relatedness" does not remotely exist in this case.

"Congress did not intend for RICO to be a stalking-horse for the punishment of every wrongful act." *Id.* Accordingly, because plaintiffs have failed to allege facts that if established by evidence would support a RICO claim, count one shall be dismissed with prejudice.

*Lanham Act*

Defendants Fraidin, Venture Cycle, and HBD have moved to dismiss count six of the amended complaint, which alleges a claim for violation of section 43(a) of the Lanham Act.[7] The Lanham Act claim is based on defendants' broadcast of an infomercial that is allegedly "literally false and/or misleading in that it misrepresents as fact that ... Lundin is *still* affiliated with Venture Cycle in a management capacity and that he *still* endorses, sponsors or approves of the LandRider Bicycle." Compl. ¶ 99 (emphases added). In particular (and more accurately), the infomercial describes Lundin as a member of Venture Cycle's "Design Team" for the LandRider bike and depicts him "touting" the LandRider technology. Plaintiffs contend that this depiction is literally false because at the time of the broadcast, HBD had terminated the Agreement. In the alternative, plaintiffs contend that the infomercial is "literally true but misleading" because Lundin endorses the LandRider bike in the infomercial, and the *present broadcast* of a *past endorsement* is allegedly "likely

7. Defendants' principally argued in support of their motion to dismiss that plaintiffs' Lanham Act claim fails because Lundin lacks the "celebrity" status they say is essential to a cognizable "false endorsement" claim. *See, e.g., ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 925–26 (6th Cir.2003)("False endorsement occurs *when a celebrity's identity* is connected with a product or service in such a way that consumers are likely to be misled about *the celebrity's sponsorship or approval of the product or service.*")(emphasis added). I reject this contention; it cannot be said at this stage, as a matter of law, that Lundin's *persona* so lacks commercial value as to fall without the scope of Lanham Act protection. To the contrary, if, drawing all inferences in favor of plaintiffs, Lundin could indeed allege facts which, if proven, would support a finding of a "likelihood of confusion among the public" in respect to his "endorsement" of the LandRider bike, I would deny the motion to dismiss. As discussed in text, however, I am not persuaded that, even drawing all inferences in favor of Lundin, the allegations of the amended complaint would support a finding of a "likelihood of confusion."

to confuse customers" as to Lundin's *continued endorsement* of the LandRider.[8]

In this respect, plaintiffs assert a Lanham Act "false endorsement" claim.[9] Judge Messitte recently summarized the elements of such a claim as follows:

> Courts have recognized a § 43(a) injury "where the plaintiffs' voices, uniforms, likenesses, published words, or names were used in such a way as to deceive the public into believing that they endorsed, sponsored, or approved of the defendant's product." *Advanced Res. Int'l, Inc. v. Tri–Star Petroleum Co.*, 4 F.3d 327, 334 (4th Cir.1993). In an action for false endorsement, the plaintiff must prove the likelihood of consumer confusion as to the origin, approval or endorsement of the product. *See Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1110 n. 9 (9th Cir.1992).

*Comins v. Discovery Communications, Inc.*, 200 F.Supp.2d 512, 522 (D.Md.2002). A contested statement or representation violates section 43(a) of the Lanham Act where it is either "false on its face or, although literally true, likely to mislead and to confuse customers given the merchandising context." *Mylan Labs., Inc.*, 7 F.3d at 1138.

Plaintiffs' claim that the infomercial is false on its face is without merit. The allegedly false statement that Lundin was a "member of the Design Team," is in fact true. The amended complaint states: "Lundin spent ... approximately 1.5 years in uncompensated time in assisting the inventor in developing LandRider Technology ...". Compl. ¶ 13. Thus, it is clear that whether or not Lundin was employed by or consulting with Fraidin and his companies when the infomercial was created, edited or broadcast, *he was part of the LandRider Design Team.*

Furthermore, the *continued use* of the infomercial, either in its original or edited form, is neither misleading nor "likely to confuse" consumers in any manner relevant to plaintiffs' Lanham Act false endorsement claim. The only "impression" that the infomercial leaves on the viewer is that Lundin was part of the LandRider Design Team and that he believes the Land Rider is a desirable product for biking enthusiasts. *Both assertions were and are true.* As stated, *supra*, Lundin funded and assisted in the development of the LandRider technology and worked on obtaining the patent. Importantly, he also participated in the creation of an infomercial in which he allowed himself to be filmed wearing a Venture Cycle t-shirt. Although Lundin did not execute a written consent to appear in the infomercial and alleges that his reasonable expectation was that his likeness would only be used while he was employed by HBD pursuant to the Agreement, there are no facts

---

8. Plaintiffs attached a copy of the infomercial to the amended complaint. I have viewed the infomercial in its entirety, although Lundin actually appears in less than two minutes of the 30 minute infomercial.

9. As relevant here, section 43(a) of the Lanham Act provides:

>(a) Civil action
>
>(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action.
>
>15 U.S.C. § 1125(a)(1)(A).

alleged that would show that HBD's use of Lundin's image "misleads" or "confuses" the public, or is likely to do so. Instead, the facts alleged demonstrate that the infomercial identifies Lundin's *actual* association with and assessment of the LandRider technology.

Tellingly, at the hearing on the motion to dismiss, plaintiffs did not dispute my assertion that the only reason plaintiffs wish now to "withdraw" Lundin's endorsement of the LandRider is because Fraidin has cut them out of the revenue presently being generated by LandRider sales, allegedly in breach of the terms of the Agreement. But, as a matter of law, Lundin may not be heard to claim a "likelihood of confusion" to the bicycle-consuming public on this basis. It is surely true that, apart from issues of national or global environmental impacts or the payment of living wages to workers, "the public" is wholly unconcerned with the niceties of the complex commercial agreements which underlie the marketing of this country's vast array of trademarked consumer goods. "Confusion" as to whether Lundin is getting paid does not count.

Manifestly, this case bears no resemblance to those leading cases in which courts upheld false endorsement claims. In those cases, the facts generally involved depictions of or statements attributed to well-known individuals who in fact were in no way associated with the defendant's product. *See, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (recognizing claim under section 43(a) where uniform worn by star of X-rated movie was confusingly similar to plaintiff Dallas Cowboy Cheerleaders' trademark uniforms, falsely creating the impression that plaintiffs "sponsored or otherwise approved the use" of the uniform); *Allen v. Men's World Outlet, Inc.,* 679 F.Supp.

360, 368 (S.D.N.Y.1988) (celebrity stated a claim under section 43(a) by showing that advertisement featuring photograph of a look-alike falsely represented that advertised products were associated with him); *Chicago Lawyer, Ltd. v. Forty–Sixth Ward Regular Democratic Organization,* 220 U.S.P.Q. 511, 1982 WL 1283 (N.D.Ill. Sept. 17, 1982) (plaintiff publisher had cause of action under Lanham Act where the defendant, a democratic precinct captain, reprinted excerpts from plaintiff's publication so as to falsely imply plaintiff's endorsement and sponsorship of defendant's candidates); *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.,* 681 F.2d 397 (5th Cir.1982) (Better Business Bureau had Lanham Act claim when weight reduction center used its name in its advertising, falsely implying that its program was endorsed by the Better Business Bureau).

During oral argument, plaintiffs drew attention to *Ryan v. Volpone Stamp Co., Inc.,* 107 F.Supp.2d 369 (S.D.N.Y.2000), as supportive of their Lanham Act claim. In *Ryan,* former Major League Baseball pitcher Nolan Ryan brought suit against a former licensee, Volpone Stamp Co., Inc., for its continuing sale of stamps, coins, autographed items, and other memorabilia utilizing his name, signature, and likeness. Ryan alleged that Volpone improperly sold such products after he had terminated the licensing agreements pursuant to which he had authorized the marketing of such products. *Id.* at 375.

In opposing Ryan's motion for a preliminary injunction, Volpone argued that there was no "likelihood of confusion" or actual confusion under section 43(a) of the Lanham Act because, *inter alia,* production of the goods had occurred during the existence of the licensing agreements, was therefore authorized, and, consequently, the goods were "genuine," and also be-

cause a former licensee is entitled to dispose of its inventory under the circumstances extant in that case. *Id.* at 383. The court rejected the former licensee's defenses and concluded that Ryan had stated a viable Lanham Act false endorsement claim, notwithstanding the fact that he had indeed authorized the manufacture of the products prior to the termination of the licensing agreement, and notwithstanding the fact that Ryan was accused of breach of contract. *Id.* at 386 ("Defendant contracted for the right, the license, to use Nolan Ryan's name, signature and likeness in exchange for royalties. Alleging a breach by Ryan, Volpone chose to stop paying royalties, which it had the right to do. *However, having made that choice, it did not have the right to also continue enjoying the license.*") (emphasis added).

This result is unsurprising. Just as a franchisor or similar licensor of trademarked goods and services has a federally-protected, enforceable right to *impose conditions on* the use of its marks, and to *withdraw* its permission for the continued use of its marks, in interstate commerce so as to avoid a "likelihood of confusion," i.e., to protect its rights in maintaining the purity, quality, or soundness of its licensed goods and services, so too, does a "personality" have a Lanham Act right to impose conditions on, and to withdraw his consent to, the continuing use of his "mark." *Cf. ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 926 (6th Cir.2003)(observing that in a "false endorsement" claim under the Lanham Act, the "'mark' at issue is the plaintiff's identity").

*Ryan* has no application to the case at bar. In *Ryan*, the court was faced with a claim for unauthorized merchandising, i.e., in express violation of the terms of the grant of authority, of Ryan's "personality," indeed, products with the plaintiff's actual name and autograph on them. Those facts

bear no resemblance to the facts here, where the claim is based on the broadcast of an infomercial that is in no sense *a misrepresentation* of Lundin's association with the LandRider bike technology, and is in no sense *a violation* of the authority granted by plaintiffs to the defendants to use Lundin's likeness. Thus, *Ryan* does not preclude a ruling in favor of Fraidin on the motion to dismiss.

Indeed, plaintiffs' reliance on *Ryan* exposes the true nature of their claim. In essence, plaintiffs seek to have the court *imply* under the Lanham Act a cause of action that would permit one who *donated* his image for commercial purposes in electronic media *without an agreement containing conditions or limitations* as to such use, to have the court *create or impose such an agreement where one does not exist,* regulating the *truthful* use by a defendant of the plaintiff's *donated* image which defendant preserved in such electronic media. In other words, plaintiffs' Lanham Act claim rests entirely on the extraordinary assertion that Lundin had a "reasonable expectation [which, although he did not protect it by contract, he is entitled to have the courts protect as a matter of federal law] that his likeness would only be used as long as he was employed and compensated as an [HBD consultant] pursuant to the Agreement." Comp. ¶ 47 (alterations added). I can discern no basis in law for implying such a cause of action, however. To the contrary, in respect to a sale of trademarked goods, federal law is precisely to the contrary. *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991)("As a general rule, trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent. *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987)."); *see also John Paul*

*Mitchell Systems v. Pete–N–Larry's, Inc.,* 862 F.Supp. 1020, 1023 (W.D.N.Y. 1994)("Of course, the mere fact that the sale is unauthorized—that is, without consent—does not give rise to an infringement claim when the marked goods are genuine. *See H.L. Hayden Co. of N.Y. v. Siemens Medical Systems,* 879 F.2d 1005, 1023 (2d Cir.1989) ('the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation').").

State law claims of invasion of privacy(right to publicity)/misappropriation and/or unjust enrichment may provide a remedy for such a "wrong" as that plaintiffs allege here, but plaintiffs have not demonstrated that federal law provides a remedy. "Although publicity rights are related to laws preventing false endorsement, they offer substantially broader protection." *Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 95 F.3d 959, 967 (10th Cir.1996). Accordingly, the ostensible Lanham Act "false endorsement" claim, based on Lundin's withdrawal of consent to the continued use in the infomercial for the LandRider bike of his donated image, shall be dismissed with prejudice.

### IV.

For the reasons stated above, I conclude that plaintiffs have failed to state a claim upon which relief can be granted under RICO or the Lanham Act. In the absence of complete diversity of citizenship, I shall decline to exercise supplemental jurisdiction and shall dismiss without prejudice the remaining, state law claims. 28 U.S.C. § 1367(c)(3); *see generally Andrews v. Anne Arundel County, Md.,* 931 F.Supp. 1255, 1267–68 (D.Md.1996), *aff'd,* 114 F.3d 1175 (4th Cir.)(table), *cert. denied,* 522 U.S. 1015, 118 S.Ct. 600, 139 L.Ed.2d 489 (1997). An order follows.