PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PAINTER'S MILL GRILLE, LLC, d/b/a
Cibo's Bar & Grill; ALESSANDRO
VITALE; SERGIO VITALE; RINALDO
"ALDO" VITALE,
            *Plaintiffs-Appellants,*

v.

HOWARD S. BROWN; 100 PAINTERS
MILL, LLC; DAVID S. BROWN
ENTERPRISES, LTD; CARMELLA BELL;
MARJORIE A. GOODMAN AND
MAURICE OFFIT, Personal
Representatives of the Estate of
Lee N. Sachs,
            *Defendants-Appellees.*

No. 12-1357

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:11-cv-01607-RDB)

Argued: January 29, 2013

Decided: May 24, 2013

Before NIEMEYER, DUNCAN, and
FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge Duncan and Judge Floyd joined.

**COUNSEL**

**ARGUED:** Richard Winelander, Baltimore, Maryland, for Appellants. Ramona Raula Cotca, THOMPSON O'DONNELL LLP, Washington, D.C.; John S. Vander-Woude, ECCLESTON & WOLF PC, Hanover, Maryland, for Appellees. **ON BRIEF:** Randall H. Norton, THOMPSON O'DONNELL LLP, Washington, D.C., for Appellees Howard S. Brown, 100 Painters Mill, LLC, and David S. Brown Enterprises, Ltd.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this appeal, we evaluate the legal sufficiency of a complaint filed by Painter's Mill Grille, LLC, the owner and operator of a restaurant in Owings Mills, Maryland, and its principals against the restaurant's landlord, 100 Painters Mill, LLC, and its agents. The complaint alleges that the landlord and its agents, motivated by racial animus, interfered with Painter's Mill Grille's business and its opportunity to sell the restaurant, including its leasehold interest, in violation of 42 U.S.C. §§ 1981, 1982, and 1985(3), as well as state tort principles.

The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6), finding generally that Painter's Mill Grille's principals did not have standing to be plaintiffs and that Painter's Mill Grille did not set forth sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We agree and accordingly affirm.

I

Painter's Mill Grille operated a restaurant known as Cibo's Bar & Grill, leasing the premises from 100 Painters Mill. The

long-term lease, which commenced in 2002, provided that Painter's Mill Grille could not assign its leasehold rights without 100 Painters Mill's consent.

The relationship between landlord and tenant was a rocky one. Painter's Mill Grille repeatedly failed to pay rent as due, leading 100 Painters Mill to obtain multiple judgments against it for unpaid rent. In October 2008, Painter's Mill Grille entered into an Asset Purchase Agreement with Earnest and Betty Hines, who agreed to purchase Painter's Mill Grille's interest in the restaurant through their company Cibo-Grille, LLC, but the deal fell through sometime after April 2009. In January 2010, Painter's Mill Grille filed for bankruptcy protection, but the proceeding was later dismissed.

Painter's Mill Grille and its principals commenced this action against 100 Painters Mill, as well as 100 Painters Mill's parent company, David S. Brown Enterprises, Ltd., and three employees of both companies, Howard S. Brown, Lee Sachs, and Carmella Bell, seeking damages for what they allege was the defendants' racially motivated interference with the restaurant's business and with the contract between Painter's Mill Grille and the Hineses' company.

In the complaint, the plaintiffs alleged that during the course of the lease with 100 Painters Mill, Painter's Mill Grille's "clientele began to change until it became predominantly African-American. As the racial mix of the clientele changed, all of the Defendants became progressively more hostile to the Plaintiffs." Without reciting when, where, and under what circumstances, the plaintiffs alleged that Brown, Sachs, and Bell "would refer to [the restaurant's] African-American clientele as the 'Element,' the 'Undesirable Element,' or 'Niggers.'" They alleged that 100 Painters Mill arbitrarily charged rent, common area maintenance fees, and attorneys' fees and that it unreasonably refused to allow the restaurant to use the patio and to install proper signage to advertise the business. They claimed that the defendants

repeatedly turned off lights in the common area, which was used to access the restaurant, or locked the doors to the common area, barring access of patrons. They alleged that the defendants had refused to accept money tendered for rent and that the rent court prosecutions were based in part on unsubstantiated amounts and were intended to drive Painter's Mill Grille "out of their building and out of business." They also alleged that Brown, Sachs, and Bell instructed fellow employees not to patronize the restaurant.

As a result of the defendants' "constant harassment," the plaintiffs alleged that Painter's Mill Grille decided to sell its business and, pursuant to that decision, entered into the Asset Purchase Agreement with the Hineses. After the appropriate approval was received from Baltimore County to assign the liquor license, the parties met in April 2009 to discuss the transaction. 100 Painters Mill was represented at the meeting by its in-house attorneys Sachs and Bell. During the course of that meeting, the plaintiffs alleged that Sachs asked the Hineses, who are African-American, if they were going to open another "chicken and waffle shack," and both Sachs and Bell made "unfounded derogatory comments and accusations about [the restaurant], the Plaintiffs, and the Plaintiffs' African-American clientele." The plaintiffs also alleged that the defendants unreasonably withheld consent from Painter's Mill Grille to assign its lease interest to the Hineses' company. They claimed that the derogatory comments and the withheld consent were designed to—and, in fact, did—cause the Hineses' company to breach its contract with Painter's Mill Grille.

Based on these allegations, the plaintiffs asserted multiple claims, including seven counts alleging violations of 42 U.S.C. §§ 1981, 1982, 1985(3), and state law prohibitions against interference with contracts and economic relationships.[1]

---

[1]The complaint also included Count VIII, alleging abuse of process, and Count IX, alleging breach of contract. But the plaintiffs did not appeal the district court's dismissal of those counts.

The defendants filed motions to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and, alternatively, for summary judgment under Rule 56. By order dated February 21, 2012, the district court granted the motions to dismiss. In its memorandum opinion, the court first addressed the ability of Painter's Mill Grille's principals (Alessandro Vitale, Sergio Vitale, and Rinaldo Vitale) to be plaintiffs in the action, concluding that "the Vitales, as members of Painter's Mill Grille, LLC, cannot bring individual claims against Defendants for injuries to their business" and that, consequently, "Painters' Mill Grille, LLC is the only Plaintiff with standing to bring this action."

The court also dismissed with prejudice all claims against Sachs and Bell, holding that, as lawyers "acting within the scope of their legal representation of Brown Enterprises and 100 Painters Mill, LLC, they are not individually liable."

The court then dismissed *without prejudice* the plaintiffs' claims of racial discrimination under 42 U.S.C. §§ 1981 and 1982 (Counts I, II, and III), concluding that, especially in light of the multiple judgments against Painter's Mill Grille for unpaid rent, it had failed plausibly to allege sufficient facts to show that the defendants were liable under those statutes.

As for the plaintiffs' § 1985(3) conspiracy claim (Count IV), the court dismissed the claim with prejudice, relying on the proposition that agents of a corporation who are acting in that capacity generally cannot conspire with each other or with their corporate principal; the plaintiffs therefore "cannot allege that two or more persons conspired against them."

And finally with respect to the state law claims, the court decided to retain supplemental jurisdiction in the interests of judicial economy, fairness, and convenience. It dismissed Counts V and VI with prejudice, holding that the plaintiffs could not state claims for tortious interference with contract based on allegations that the defendants induced the Hineses

and an unidentified third party to breach contracts to buy plaintiffs' business, reasoning that because Painter's Mill Grille could not contract to assign the lease to a third party without the landlord's consent, the defendants could not be liable for interfering with "a contract to which they have a relationship." Finally, the court dismissed *without prejudice* the claim of tortious interference with economic relationships (Count VII) on the ground that the plaintiffs had failed to allege specific, actionable wrongful acts committed by the defendants.

When the plaintiffs filed an appeal from the district court's February 21, 2012 order, the defendants moved to dismiss the appeal as interlocutory because the district court had dismissed several of the plaintiffs' claims without prejudice. In opposing that motion, the plaintiffs argued that "[w]here, as here, a plaintiff elects to stand on the complaint rather than amend it, the order dismissing [the] action without prejudice becomes appealable." Based on this election by the plaintiffs, we denied the defendants' motion to dismiss the appeal by order dated June 15, 2012.

II

Alessandro, Sergio, and Rinaldo Vitale contend that the district court erred in dismissing them as plaintiffs and holding that Painter's Mill Grille was the only proper plaintiff. They contend that they were proper plaintiffs because they "suffered personal out-of-pocket losses" as a result of the defendants' discrimination against the restaurant's African-American clientele and its prospective purchasers. They claim that they "had an independent claim for emotional distress and the financial losses personal to them," including "the loss of net profits that would have flowed to them from the sale of [the restaurant] to the Hineses, the [money they borrowed] to refinance [the restaurant's] startup expenses, and the [money] they owe[d] to the State of Maryland for back taxes."

The Vitales recognize that their claims are related to and flow from the contractual relationships between their company, Painter's Mill Grille, and others, such as its landlord and its clientele. But they argue that they should be able to bring this action because they suffered *personal* damages flowing from the defendants' interference with these contractual relationships.

In advancing their arguments, however, the Vitales have failed to account for the fact that they elected to conduct their business through a limited liability company ("LLC") and that, just as they received protection of their personal assets from liability in doing so, they also assumed a role as agents for the company. At bottom, they gave up standing to claim damages to the LLC, even if they also suffered personal damages as a consequence. The Supreme Court's decision in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006), forecloses just such claims.

In *Domino's Pizza*, John McDonald, the president and sole shareholder of a corporation that had contracted with Domino's Pizza, contended that Domino's Pizza breached its contract with McDonald's corporation because of its racial animus toward McDonald, in violation of 42 U.S.C. § 1981. He alleged that Domino's Pizza's breach injured him *personally* by causing him "to suffer monetary damages and damages for pain and suffering, emotional distress, and humiliation." *Domino's Pizza*, 546 U.S. at 473 (internal quotation marks omitted). While the Ninth Circuit recognized McDonald's claim on the ground that McDonald's injuries were "distinct from that of the corporation," *id.* at 474 (internal quotation marks omitted), the Supreme Court rejected that proposition, stating:

> [I]t is fundamental corporation and agency law— indeed, it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and

is exposed to no liability under the corporation's contracts.

*Id.* at 477. To circumvent this principle, McDonald argued that it was he who was the "actual target of discrimination" and that he personally lost "some benefit that would otherwise have inured to him had [the] contract not been impaired" by Domino's Pizza. *Id.* at 478 (internal quotation marks omitted). The Court also rejected that argument, however, stating:

> [W]e hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes to make and enforce. Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's.

*Id.* at 479-80 (internal quotation marks omitted).

*Domino's Pizza* directly forecloses the Vitales' § 1981 claims asserted in Counts I and II of the complaint. Count I alleges that the defendants interfered with the restaurant's ability to contract with its African-American clientele, and Count II alleges that the defendants interfered with the restaurant's ability to contract with the Hineses. Because the Vitales have no rights under any of these contracts, they cannot bring § 1981 claims with respect to them, even though they may have personally suffered injury as a consequence.

The same principles apply to Count III, where the plaintiffs allege that the defendants "impaired Plaintiffs' rights to lease and/or convey real and personal property in violation of 42 U.S.C. § 1982." As in Counts I and II, the Vitales did not themselves hold the leasehold interest; rather, it was held by their company, Painter's Mill Grille. Following *Domino's Pizza*, we likewise hold that § 1982 protects only the right "to inherit, purchase, lease, sell, hold, and convey real and per-

sonal property" *on one's own behalf.* 42 U.S.C. § 1982; *see also CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 447 (2008) ("[O]ur precedents have long construed §§ 1981 and 1982 similarly"). And the result is not different even when we recognize that the Vitales personally guaranteed their company's lease obligations. *See Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1073 (10th Cir. 2002) (holding that an individual who was the sole shareholder of a tenant company could not state a § 1982 claim against the landlord and management company and that "[plaintiff's] status as guarantor of the previous lease is of no significance to her claim that the defendants refused to . . . lease to her corporation").

In Count IV, the Vitales purport to state a conspiracy claim pursuant to 42 U.S.C. § 1985(3). Again, they cannot do so. The conspiracy count is premised on the alleged violations of §§ 1981 and 1982. Because they have no claims under those provisions, they also failed to state a conspiracy claim.

Finally, for similar reasons, the Vitales do not have claims under state law for tortious interference with contract and with economic relationships (Counts V, VI, and VII) when they were not parties to either the contracts or the economic relationships upon which those claims are based and when the injuries they allegedly suffered derived entirely from the injury their company allegedly sustained. *See Fraidin v. Weitzman*, 611 A.2d 1046, 1057 (Md. Ct. Spec. App. 1992) (identifying the "existence of a contract between *plaintiff* and a third party" as one of the elements of tortious interference with contract (emphasis added)); *Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946) ("[T]he cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation").

Accordingly, we affirm the district court's order dismissing the Vitales as plaintiffs in this case.[2] This leaves us with the claims of Painter's Mill Grille.

### III

In Counts I and II of its complaint, Painter's Mill Grille alleges that the defendants interfered with its ability to make contracts through conduct motivated by racial animus, in violation of 42 U.S.C. § 1981 (providing in pertinent part that "[a]ll persons . . . have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens"). As Painter's Mill Grille explains, Count I "addresses [its] contracts with its African-American clientele to purchase food and beverages," and Count II "addresses [its] contract with the African-American couple [the Hineses] who sought to purchase the business."

Count I, alleging that the defendants' conduct interfered with potential contracts with African-American clientele, contains only conclusory and speculative allegations, setting forth no facts to support a plausible claim. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The complaint does allege facts giving rise to tension between Painter's Mill Grille and the defendants, asserting that the defendants "unreasonably refused to allow [Painter's Mill Grille] to use the patio and to install proper signage to advertise the business"; that the defendants "repeatedly turned off the lights in [the] common area [necessary for access to the restaurant] and or locked the doors to the common area barring access of patrons to [the restaurant] during its normal operating hours"; that the defendants improperly charged rent and pursued rent court prosecutions;

---

[2]The plaintiffs also challenged the district court's ruling that Sachs and Bell, as lawyers for 100 Painters Mill, could not be individually liable to them. We do not reach their argument, however, in light of our rulings on the sufficiency of the allegations made to support the substance of each count.

and that the defendants instructed their employees not to patronize the restaurant. Based on this conduct, the complaint concludes in Count I:

> Because of the repeated acts of the Defendants intended to injure, damage or destroy [Painter's Mill Grille's] business and drive Plaintiffs from the leased premises, because of the race of its clientele, the individual Defendants impaired Plaintiffs' rights to make and enforce contracts in violation of 42 U.S.C. § 1981.

There are no facts, however, about who in particular was denied business, when, and the circumstances. There is not even an allegation that this conduct actually caused any patron the inability to purchase goods and services from the restaurant. Painter's Mill Grille asks the court to assume that it was *defendants' conduct* that ultimately caused the restaurant to go out of business, as opposed to one of the many reasons that can cause restaurants to fail. But this type of allegation claiming damage to a business based on generally alleged conduct is conclusory and speculative and, as such, is insufficient to satisfy the requirement of demonstrating that the conduct interfered with Painter's Mill Grille's *ability to enter into contracts* with any of its patrons, in violation of § 1981. *See Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989) ("Plaintiff has alleged that defendants' actions have interfered with his 'prospective business opportunities,' but we find that vague and conclusory allegation insufficient to state a deprivation of the right to make and enforce contracts that is protected by Section 1981" (citation omitted)).

It is now well established that mere conclusory and speculative allegations are not sufficient to withstand a motion to dismiss. As the Supreme Court has stated, to withstand a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim). Yet Painter's Mill Grille's allegations with respect to its loss of clientele suffer from just these deficiencies. While the district court gave Painter's Mill Grille an opportunity to amend its complaint to cure the problem by dismissing the claim without prejudice, Painter's Mill Grille elected to stand on its complaint as written. Accordingly, because we conclude that Count I's allegations are insufficient, we affirm the district court's dismissal of that claim.

Count II, alleging that defendants' conduct interfered with Painter's Mill Grille's contractual right to sell its business and assign its leasehold to the Hineses' company, sets forth facts of interference committed in two ways: (1) 100 Painters Mill unreasonably withheld consent from Painter's Mill Grille to assign its leasehold to the Hineses; and (2) 100 Painters Mill's lawyers, Sachs and Bell, stated to the Hineses at an April 2009 meeting that they did not want another "chicken and waffle shack" at the site and made derogatory comments about the restaurant and its customers.

The first allegation that the defendants withheld consent would probably state a claim, as it would involve 100 Painters Mill's discriminatory use of its *contractual power* to deny assignment. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969). As the Tenth Circuit has noted, "[r]elief is available under § 1981 where a party discriminatorily *uses its authority* to preclude an individual from securing a contract with a third party," emphasizing that a plaintiff seeking to establish a § 1981 claim by this route must "show that the [defendant] both *possessed sufficient authority* to significantly interfere with the individual's ability to obtain contracts with third parties, and that the [defendant] *actually exercised that authority* to the [plaintiff's] detriment." *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002) (emphasis added);

*see also Shaikh v. City of Chicago*, 341 F.3d 627, 629 (7th Cir. 2003) ("[Plaintiff's] §§ 1981 and 1982 claims fail for a . . . fundamental reason: Because the City had no power directly to affect [a third party's] proposed sale of the property to [plaintiff], it did not unlawfully or unconstitutionally impede upon [his] ability to purchase the building").

The complaint does indeed allege, as required, that the defendants, with racial animus, interfered with Painter's Mill Grille's contract to sell the restaurant to the Hineses by unreasonably withholding consent to an assignment that 100 Painters Mill had the legal authority to withhold or give. But Painter's Mill Grille has affirmatively abandoned this basis for its § 1981 claim, repeatedly representing to us both in its brief and at oral argument that the landlord, 100 Painters Mill, actually gave its consent for the lease's assignment prior to the April 2009 meeting. Accordingly, this alleged method of interference is no longer a basis for Painter's Mill Grille's § 1981 claim.

This leaves Painter's Mill Grille with only its allegations that "derogatory comments and accusations" were made by Sachs and Bell at the April 2009 meeting, "caus[ing] the prospective buyers to breach their written contract for the purchase of the business." But especially given the fact that the landlord had already consented to the leasehold's assignment, the complaint does not allege that Sachs and Bell "possessed sufficient authority to significantly interfere" with Painter's Mill Grille's contract to sell its business. *Harris*, 300 F.3d at 1197. In addition, no allegations are made that Sachs and Bell were *exercising that authority* when making those remarks. *Id.* The statements in no way were directed at *precluding* Painter's Mill Grille from selling the restaurant to the Hineses. Nor were they the kind of threats that might "legitimately and reasonably impair an individual's freedom to contract or purchase property." *Shaikh*, 341 F.3d at 632.

Accordingly, we conclude that Sachs and Bell's derogatory comments did not constitute the kind of interference *with a*

*contractual interest* that gives rise to a § 1981 claim. For this reason, we also affirm the district court's dismissal of Count II.

IV

In Count III, Painter's Mill Grille alleged that the defendants interfered with its ability to lease and convey real property, in violation of 42 U.S.C. § 1982 (providing that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property"). Relying on the same conduct alleged to support Count I, Painter's Mill Grille alleged that the defendants drove plaintiffs "from the leased premises and otherwise injur[ed], damag[ed] and destroy[ed] [Painter's Mill Grille's] business."

We conclude that this Count fails to state a claim for the same reasons that we gave for concluding that Count I failed to do so. Indeed, both counts rely on the same factual allegations and reach similar conclusions that were designed to satisfy the requirements of either § 1981 or § 1982. But no facts are alleged as to *how* Painter's Mill Grille was driven out of business. To the contrary, the restaurant was an ongoing concern that the Hineses agreed to purchase. And there are no allegations that the clientele decreased, failed to come, or were diverted. Indeed, there is not even an allegation that the defendants had any direct contact with Painter's Mill Grille's clientele so as to interfere with their relationship with the restaurant. To be sure, 100 Painters Mill allegedly instructed its employees not to frequent the restaurant, but there is no allegation that they otherwise would have been customers or that the number of employees involved was large enough to have any impact on Painter's Mill Grille's operations.

In addition to the allegations that related to interference with Painter's Mill Grille's clientele, there are additional allegations that relate to driving the restaurant out of business that

have to do with the defendants' repeated effort to collect rent through the judicial process. But again, no allegations are made that these judicial rent collection procedures actually resulted in dispossessing Painter's Mill Grille of the premises. They did result in judgments, but surely these prior judgments cannot be relitigated here.

As we observed with respect to Count I, Painter's Mill Grille's allegations are conclusory and speculative and therefore insufficient to support a plausible claim for relief. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555, 570 (a complaint must contain more than "labels and conclusions"; it must allege "enough facts to state a claim to relief that is plausible on its face").

We note, again, that Painter's Mill Grille was given the opportunity to amplify its allegations in an effort to state a plausible claim for relief, but it elected to stand on its complaint. Accordingly, we affirm the district court's dismissal of Count III.

V

In Count IV of the complaint, Painter's Mill Grille alleges a conspiracy to deprive it of equal protection of the laws, in violation of 42 U.S.C. § 1985(3) (making it unlawful to conspire "for the purpose of depriving . . . any person . . . equal protection of the laws, or of equal privileges and immunities under the laws"). It alleges that the defendants Brown, Sachs, and Bell conspired "to deprive Plaintiffs of equal enjoyment of their rights to lease property, [and] make and enforce contracts" with Painter's Mill Grille's clientele and prospective purchasers of Painter's Mill Grille. It also alleges that Brown Enterprises and 100 Painters Mill are directly and vicariously liable for all of the wrongful acts of their employees, Brown, Sachs, and Bell.

As alleged in the complaint, 100 Painters Mill was the landlord of Painter's Mill Grille, and Brown Enterprises was

100 Painters Mill's parent. Brown, Sachs, and Bell are alleged to have been employees of both companies.

The district court concluded that Brown, Sachs, and Bell could not conspire with each other, as alleged, by reason of the intracorporate conspiracy doctrine. We agree.

The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own. *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("[U]nder the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation"). As such, suing the agents individually does not destroy "the immunity granted under the doctrine." *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985). There are, however, two important exceptions to the doctrine. First, it is generally inapplicable "where a co-conspirator possesses a personal stake independent of his relationship to the corporation." *ePlus Tech.*, 313 F.3d at 179; *see also Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). Second, a plaintiff may state a conspiracy claim where the agent's acts were not authorized by the corporation. *Buschi*, 775 F.2d at 1252-53.

Given that the complaint alleges that the three conspirators were also agents of the same two companies, it cannot allege a conspiracy between two or more persons unless an exception to the intracorporate conspiracy doctrine applies.

Painter's Mill Grille argues that it has sufficiently alleged an exception because the individual defendants had an independent personal stake in achieving the corporation's illegal objective—namely, their personal racial animus. That argument, however, would "render[ ] the intracorporate conspiracy doctrine meaningless" in the context of § 1985(3) claims "because every claim under that statute depends on a showing that the conspirators shared an invidiously discriminatory

motivation." *Hartman v. Bd. of Trustees of Community Coll. Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993) (internal quotation marks omitted). In *Hartman*, the court concluded that the intracorporate conspiracy doctrine "is not avoided simply by showing that corporate employees were motivated in part by personal bias," although it "probably would not apply where corporate employees are shown to have been motivated *solely* by personal bias" because "[i]n that case, the interests of the corporation would have played no part in the employees' collective action, so the action could not have been taken within the scope of employment." *Id.* (emphasis added).

We conclude that Painter's Mill Grille has not alleged that the individual defendants "possess[ed] a personal stake independent of [their] relationship to" their employer or that they were acting outside the scope of their employment. *ePlus Tech.*, 313 F.3d at 179. Instead, it alleges that the individual defendants were acting at all times as "agent[s], servant[s] and/or employee[s]" of the corporate defendants and that the corporate defendants are therefore vicariously liable. Accordingly, we affirm the district court's dismissal of Count IV of the complaint.

## VI

Counts V, VI, and VII purport to allege three state law claims for tortious interference with contract and economic relationships. The district court dismissed these claims for much the same reasons given to dismiss their federal counterparts. We likewise affirm the dismissal of these claims.

"Maryland recognizes the tort action for wrongful interference with contractual or business relationships in two general forms: inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 268 (Md. 1994) (internal quotation marks omitted). To establish a claim for

wrongful interference *with a contract*, a plaintiff must demonstrate "(1) [t]he existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom." *Blondell v. Littlepage*, 968 A.2d 678, 696 (Md. Ct. Spec. App. 2009) (internal quotation marks omitted), *aff'd*, 991 A.2d 80 (Md. 2010). And to establish a claim for intentional interference *with economic relationships*, a plaintiff must demonstrate "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Alexander & Alexander*, 650 A.2d at 269 (internal quotation marks omitted).

In Count V, much like Count II, Painter's Mill Grille alleged that the defendants intentionally induced the Hineses to cause their company, CiboGrille, to breach its contract to buy the restaurant from Painter's Mill Grille. Yet Painter's Mill Grille's remaining allegations regarding *how* the defendants intentionally interfered with this contract fail to state a claim that is facially plausible. Painter's Mill Grille relies on allegations that Sachs and Bell made "unfounded derogatory comments and accusations about [the restaurant], the Plaintiffs, and the Plaintiffs' African-American clientele" at the April 2009 meeting and that Sachs repeatedly used the term "chicken and waffle shack." But without providing any additional factual allegations regarding what Sachs and Bell said, these allegations fail to explain how the statements could form the basis for an interference claim. At bottom, the complaint does not plausibly allege that Sachs and Bell made these comments intending to induce the Hineses to breach the contract with Painter's Mill Grille. The complaint's bare

assertion that the statements were made with the requisite intent does not suffice, and its "well-pleaded factual allegations" regarding the comments, limited as they are, do not "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

The claim in Count VI for tortious interference with contract stands on even weaker grounds. This count alleges that after the deal with the Hineses fell through, Painter's Mill Grille entered into a contract to sell the restaurant to an unidentified third party. It then asserts that "Defendants . . . intentionally induced the third party [to] breach its contract with Plaintiffs," without providing *any* factual allegations regarding how the defendants effected this alleged interference. Because this claim is supported by nothing more than "a formulaic recitation of the elements of [the] cause of action" it purports to assert, the district court correctly dismissed it. *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).

Painter's Mill Grille's claim in Count VII for tortious interference with economic relationships alleges, similar to the allegations in Counts I and III, that "Defendants . . . willfully and intentionally drove [Painter's Mill Grille] out of business so that it could no longer contract with [its] African-American and Spanish-American clientele." But the Maryland Court of Appeals requires the standard tort element of causation. *See Alexander & Alexander*, 650 A.2d at 269. And for the same reasons that we concluded Counts I and III failed to state a claim, we also conclude that Painter's Mill Grille has not in Count VII *plausibly* alleged that it was defendants' conduct that "drove [it] out of business so that it could no longer contract with [its] . . . clientele."

Accordingly, we affirm the district court's dismissal of the complaint's state-law tortious interference claims.

## VII

Finally, the plaintiffs contend that the district court abused its discretion by denying their request for leave to amend their complaint and for permission to conduct discovery "so that additional fact[s] can be developed to oppose the Summary Judgment aspects of the Defendants' Motions."

As to the request for amendment, the district granted the motions to dismiss as to Counts I, II, III, and VII *without prejudice*, which would have allowed the plaintiffs to file again. In order to appeal, however, the plaintiffs elected to stand on their complaint. They obviously cannot now challenge their own election. *See Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 345 (4th Cir. 2005) ("By electing to stand on her complaint, the [plaintiff] has waived the right to later amend unless we determine that the interests of justice require amendment"). Moreover, if the plaintiffs had seriously sought to amend their complaint, they would have filed, as required, a separate motion for leave to amend with the proposed amendment attached or with a statement as to how they might wish to amend their complaint. *See Francis v. Giacomelli*, 588 F.3d 186, 197 (4th Cir. 2009) (concluding "that the district court did not abuse its discretion in failing to give the plaintiffs a blank authorization to 'do over' their complaint"); D. Md. Local Rule 103.6 (requiring that a party requesting leave to file an amended pleading provide the original of the proposed amended pleading).

As to the district court's refusal to grant the plaintiffs' request for discovery, the plaintiffs' request was premature. The court dismissed the complaint under Rule 12(b)(6) *for failure to state a claim*, which brought to issue only the legal sufficiency of the complaint, not the facts relevant to the alleged claims.

The judgment of the district court is accordingly

*AFFIRMED*.