**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1874**

---

JAMES BRADY, d/b/a JB & HM Enterprises, Inc.; DANNY GROUP, LLC; BLAZIAN PROMOTIONS & COMPANY, LLC; HECTOR MELENDEZ,

　　　　Plaintiffs – Appellants,

v.

CITY OF MYRTLE BEACH; JOHN PEDERSON,

　　　　Defendants – Appellees.

---

Appeal from the United States District Court for the District of South Carolina, at Florence. Joseph Dawson, III, District Judge.  (4:19−cv−00107−JD)

---

Argued:  March 18, 2025　　　　　　　　　　　　Decided:  May 16, 2025

---

Before WILKINSON and RUSHING, Circuit Judges, and Jasmine H. YOON, United States District Judge for the Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Rushing and Judge Yoon joined.

---

**ARGUED:**  Tucker S. Player, PLAYER LAW FIRM, LLC, Columbia, South Carolina, for Appellants.  Robert W. Humphrey, II, WILLOUGHBY HUMPHREY & D'ANTONI P.A., Charleston, South Carolina, for Appellees.  **ON BRIEF:**  Thomas Brittain, BRITTAIN LAW FIRM, P.A., Myrtle Beach, South Carolina, for Appellants.  Michael W. Battle, BATTLE LAW FIRM, LLC, Conway, South Carolina, for Appellees.

WILKINSON, Circuit Judge:

This case concerns the City of Myrtle Beach's response to a violent crime surge in an area known as "the Superblock." In 2015 and 2016 alone, eleven people were shot in the Superblock. Dozens more were sexually assaulted, battered, or robbed. Because most of these crimes occurred in or around a small cluster of bars, the City increased its police presence in the area and began closely investigating the establishments for compliance with state and local safety regulations. Despite these measures, crime continued unabated. The City ultimately shut down two of the bars for repeated legal violations, and a third bar closed on its own due to lack of business.

Years later, the three bars and the landlord of one of the bars sued the City and the City Manager, bringing claims under the Takings Clause, Due Process Clause, Equal Protection Clause, and 42 U.S.C. § 1985. At bottom, each claim alleged that the City unlawfully targeted the bars because their owners and clientele were predominantly racial minorities. During the course of a jury trial, the district court granted directed verdicts for the City on all claims.

We now affirm the district court. It is clear from the record that the City acted within its lawful authority to address serious public safety threats and enforce compliance with state and local regulations. Appellants' claims to the contrary rest on nothing more than speculation and are unsupported by the evidence presented at trial.

2

I.

We begin by reciting the relevant facts introduced at trial. Because we are reviewing grants of directed verdicts for the City, we construe the facts in the light most favorable to appellants. *See Horne v. WTVR, LLC*, 893 F.3d 201, 210 (4th Cir. 2018).

The Superblock is a small commercial area in downtown Myrtle Beach. Prior to 2013, it experienced minimal violent crime. Between 2013 and 2016, however, violent crime began to surge when several late-night establishments opened in the Superblock. The owners of three such establishments are appellants in this case. Appellant Blazian Promotions & Company, LLC, owned Natalia's Bar & Grill ("Natalia's"), appellant Hector Melendez owned Pure Ultra Club, LLC ("Pure Ultra"), and appellant Danny Group, LLC, owned Ibiza Hookah Longue ("Ibiza"). The final appellant, James Brady ("Brady"), was the landlord of Pure Ultra Club.

The crime in the Superblock during this period was both frequent and severe. Between 2015 and 2016, eight individuals were shot in or just outside Pure Ultra, another was shot inside Natalia's, and two more were shot in neighboring bars. In addition to the shootings, many other individuals were sexually assaulted, beaten, or robbed. In Pure Ultra, for example, one man was assaulted and broke his foot, an assailant used his girlfriend as a human shield to block taser fire from police, and an 18-year-old woman was raped inside the club. In Natalia's, an employee sold drugs to customers, a patron punched a staff member in the face, and a DJ was arrested after police found a mason jar full of marijuana in plain view and a loaded firearm in his equipment bag.

3

In response to this rising crime, the City stepped up its police presence in the Superblock, particularly around the area's late-night establishments. The police patrolled the area, stationed vehicles in the parking lot shared by the bars, and investigated many of the establishments to ensure compliance with alcohol regulations and other safety laws. The only police expert who testified at trial, Mr. John Cocklin, described the City's response as both "reasonable and within the standard of care expected" from law enforcement officers.  J.A. 666.

Following their investigations, the police concluded that Pure Ultra and Natalia's repeatedly violated state and local laws and recommended that their business licenses be revoked. With respect to Pure Ultra, the police found that the club partnered with a promoter known for attracting gang activity, that it operated illegal gambling and adult entertainment businesses, that it served alcohol past city-imposed hours, and that its security guards were not properly certified. The City agreed with the police department's findings and revoked Pure Ultra's business license. Pure Ultra chose not to appeal the City's decision.

As for Natalia's, the police found that the bar failed to report multiple shootings in or near its premises, that it repeatedly operated without an approved security plan, and that it employed security guards who were improperly certified and inconsistent in screening patrons for weapons. As with Pure Ultra, the City revoked Natalia's business license based on the police department's findings. Natalia's appealed and, in accordance with local law, was afforded the opportunity to present evidence, call witnesses, and cross-examine the

4

City business license official in a hearing before the City Council. The City Council upheld the revocation in a detailed written opinion.

The third appellant bar, Ibiza, did not have its license revoked. It closed due to a lack of customers and its business license expired on its own terms.

Appellants presented a different view of the City's actions. According to the testimony of the bar owners, the City was not motivated by legitimate concerns over crime but by a desire to shut down businesses predominantly owned and patronized by racial minorities. They based this inference on their perception that the City targeted bars in the Superblock despite similar crime rates at white establishments elsewhere in the City and on what they viewed as an excessive and unjustified police presence at their businesses. In appellants' view, these enforcement actions amounted to harassment and violated their rights under the Takings Clause, Due Process Clause, and Equal Protection Clause. They also asserted that the City conspired to violate their constitutional rights in violation of 42 U.S.C. § 1985.

The district court disagreed and granted directed verdicts for the City on all claims. With respect to the takings claims, the district court held that the appellants did not have a constitutionally protected property interest in the right to conduct their business. As for the due process and equal protection claims, the court found that the City's enforcement actions were well within the legitimate bounds of the state police power. Last, the district court rejected the § 1985 civil conspiracy claims on the force of the intra corporate conspiracy doctrine, which establishes that corporate and government agents cannot conspire with themselves because their actions are all attributed to the same principal.

Appellants timely appealed, and we now affirm.

II.

The Takings Clause establishes that "private property" shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. The Clause naturally gives rise to two questions: What is "property" and what is a "taking"? Because the Clause itself does not define "property," the Supreme Court has long understood the term to protect existing property interests "that stem from an independent source such as state law," *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998), or from "traditional property law principles," *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023).

As for what constitutes a "taking," the Supreme Court has been clear that the government can "take" property in two distinct ways. The first is when the government "physically acquires" the property—whether by exercising its power of eminent domain or by taking possession or control of it. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). The second is when the government "imposes regulations that restrict an owner's ability to use his own property." *Id.* at 148. In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), the Supreme Court recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415. Whether a "regulation goes too far" is a fact-specific inquiry that turns on the "economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point*, 594 U.S. at 148 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

6

We start with whether appellants have a constitutionally protected property interest. Appellants assert that they have a protected property interest in "operating their businesses free from harassment, discrimination and selective enforcement." Opening Br. at 25. But the Supreme Court has been clear that "*the activity of doing business,* or *the activity of making a profit* is not property." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).

Nor do appellants have a protected property interest in their business licenses. Under South Carolina law, "an interest that depends totally upon regulatory licensing is not a property interest." *Mibbs, Inc. v. S.C. Dep't of Revenue*, 524 S.E.2d 626, 628 (S.C. 1999). That is consistent with traditional principles of property law. Since the days of the Early Republic, it has been well understood that an individual does not have a property interest in "mere 'privileges'" which "belong[] to private people only so long as the legislature allowed them to exist." Caleb Nelson, *Vested Rights, "Franchises," and the Separation of Powers*, 169 U. PA. L. REV. 1429, 1433 (2021); *see also, e.g.*, *Brick Presbyterian Church v. City of N.Y.*, 5 Cow. 538 (1826); *Metro. Bd. of Excise v. Barrie*, 34 N.Y. 657 (1866); *Bos. Beer Co. v. Massachusetts*, 97 U.S. 25 (1877).

Appellants *do* have a protected property interest in their leaseholds.[1] But appellants do not argue that the City "took" their leasehold interests. Nor could they. There is no suggestion in the record that the City physically interfered with appellants' right to possess their land pursuant to their leases. And it cannot be said that the City's enforcement actions

---

[1] Or for appellant Brady, who is a landlord, his ownership interest in his land.

went "too far" with respect to the appellant's ability to use their land. The "economic impact" of the enforced regulations is minimal, the "interference with reasonable investment-backed expectations" is nonexistent, and the "character of the government regulation" is ordinary. State laws from time immemorial have expected businesses to take basic measures to prevent crime on their premises. On top of that, the licensing laws enforced here only prevent appellants from using their land to operate a bar. That hardly "saps too much of the property's value" such that it must qualify as a "taking." *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024).

## III.

We next turn to the equal protection and due process claims. To establish a violation of the Equal Protection Clause, appellants must demonstrate that the City acted with a "discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 241 (1976). Appellants offer two theories in support of their claim that the City had discriminatory intent. First, they argue that the City's selective focus on bars predominantly owned and frequented by racial minorities demonstrates that the City acted out of racial animus. Second, appellants assert that, at minimum, the City singled out "Superblock bars" for police enforcement, which they claim is a "class of one" that suffices for equal protection purposes so long as "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Neither theory withstands scrutiny. Both rest on the logic that "other [non-minority] bars" outside the Superblock were not targeted by the police despite similar rates of crime. Opening Br. at 26. But appellants offer only five examples of such bars and merely

8

speculate—without evidence—that these other bars "did not suffer the same type of harassment." *Id.* at 15, 26. The only evidence introduced at trial on this point came from Ms. Stephanie Parran, a city regulatory officer, who testified that the City *did* close numerous bars owned and patronized by non-minorities for similar nuisance activity. J.A. 584–95.

Even putting that aside, appellants also overlook obvious, nondiscriminatory explanations for any difference in treatment. For one, the Superblock was a concentrated hub of criminal activity. Any sensible police department would focus its enforcement efforts on a small area where multiple high-crime establishments are clustered rather than on isolated bars scattered throughout the city. Indeed, Mr. Cocklin—who has led 17,000 similar investigations and was the only police expert to testify at trial—concluded that the City's actions were "reasonable, measured, and were an appropriate response given the severity of the conduct that the licensee[s] allowed to occur on [their] premises." J.A. 653–54, 681–82. Even more fundamentally, appellants ignore that the City targeted their bars not only because they were associated with crime but because they repeatedly failed to comply with state and local laws. It requires no inference of bias to understand why the City would take action against establishments that operated illegal gambling businesses, employed uncertified security, and partnered with promoters aligned with violent gangs.

The due process claims fail for a similar reason. Appellants' argument sounds in substantive due process. They claim that the City deprived them of property and that the City's actions were "so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency." Opening Br. at 28 (quoting *Sunrise Corp. of*

9

*Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005)). Even assuming that appellants were deprived of "property" within the meaning of the Due Process Clause, the City's actions were not beyond the outer limits of legitimate governmental authority. As we have explained, the City acted reasonably in responding to a documented pattern of legal violations and public safety threats posed by appellants' establishments.[2]

To the extent appellants attempt to raise a procedural due process claim, that too fails. The City provided an ample amount of process here. Before revoking the bars' business licenses, the police investigated and issued a detailed written recommendation. The City's business license official then conducted her own independent investigation and issued another written determination. Under municipal law, the bar owners then had 15 days to appeal to the City Council, where they were entitled to a formal hearing with witnesses, cross-examination, and representation by an attorney. After all of this, the bar owners were further entitled to appeal the City's final decision in state court. *See* Myrtle Beach Mun. Code. §§ 11-35, 11-36 (requiring these procedural steps). Given these multiple

---

[2] Appellant Brady also alleges that the City discriminated against him and acted outside the bounds of government authority by failing to grant a business license to one of his prospective tenants based on what he asserts was an expired moratorium on businesses selling alcohol in the Superblock. Opening Br. at 22–23. As evidence of this alleged discriminatory and arbitrary treatment, he points to another business, Grand Strand Brewing, whom Brady claims "was making beer and selling liquor in the super block" when his (Brady's) prospective tenant's license was denied. *Id.* at 23. Brady's claim is meritless. No evidence introduced at trial demonstrates that the moratorium had in fact expired, that Grand Strand Brewing was similarly situated, or that the City lacked valid reasons for denying the license.

layers of procedural protection, any suggestion that there was a deficiency of process is baseless.

IV.

We last address the § 1985 civil conspiracy claims. Appellants' argument is that the actions of city police and other officials amounted to a "conspiracy" to deprive them of their constitutional rights.

Appellants' § 1985 claims are barred by the intra corporate conspiracy doctrine. In *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342 (4th Cir. 2013), we held that "a corporation cannot conspire with its agents because the agents' acts are the corporation's own." *Id.* at 352. All the members of the alleged conspiracy—the City Manager, the Police Chief, and the Director of the Downtown Redevelopment Corporation, who oversaw planning in the Superblock—were agents acting on behalf of the City. Because the City cannot conspire with itself, there could be no conspiracy. This result reflects a sound principle of law. Public officials must often act in concert to carry out their duties, and treating such coordination as a "conspiracy" would undermine the routine functioning of government.

Appellants try to avoid this conclusion by arguing that an exception applies. In *Painter's Mill*, we did make clear that the intra corporate conspiracy doctrine does not apply "where a co-conspirator possesses a personal stake independent of his relationship to the corporation" or "where the agent's acts were not authorized by the corporation." 716 F.3d at 353 (first quoting *ePlus Tech. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002); then citing *Buschi v. Kirven*, 775 F.2d 1240, 1252–53 (4th Cir. 1985)). Appellants claim that

11

both exceptions apply here because the City officials' "racial animus" gave them a "personal stake" and placed their conduct outside the scope of "authorized" municipal conduct. Opening Br. at 36. This is simply a repackaging of the same argument we rejected in addressing the equal protection and due process claims. As already explained, the evidence demonstrates that the City's actions were motivated not out of racial animus but out of a legitimate concern for public safety. A nonexistent racial animus cannot give rise to a municipal official's "personal stake."

## V.

At bottom, appellants ask us to second-guess the City's law enforcement priorities, override its licensing decisions, and insert the federal judiciary into questions of local governance best left to elected officials. We decline to do so. These decisions fall squarely within the City's democratic prerogative. Like many beach towns, Myrtle Beach must navigate the tension between being a destination for late-night entertainment and a home for those who seek safety and quiet. Where to strike that balance is a policy judgment that the Constitution entrusts to local officials—not federal courts. We affirm the judgment of the district court.

*AFFIRMED*